[Crim. No. 4944.   Second Dist., Div. Three.   July 3, 1953.]

THE PEOPLE, Respondent, v. ROBERT ALEXANDER ETIE, JR., Appellant.

Alexander L. Oster for Appellant.

Edmund G. Brown, Attorney General, and Alan R. Woodard, Deputy Attorney General, for Respondent.

WOOD (Parker), J.—Defendant Etie and his three codefendants were charged, in five counts, with forgery of fictitious name. It was also alleged in the amended information that Etie had been convicted of felonies four times previously. He admitted that he had been convicted three times as alleged. The charges against the other defendants were determined separately from the trial of Etie. Trial by jury was waived. Etie was adjudged guilty as charged in each of the five counts. His motion for a new trial was denied. Probation was granted and execution of sentence was suspended. He appeals from the judgment.

Defendant contends that the evidence was insufficient, as to each count, to support the judgment.

On February 8, 1952, defendant went to a printing shop in Los Angeles and presented to the printer a blank form of check which was as follows:

"Los Angeles, California_____ 19_____ No._____

The Farmers and Merchants National Bank ⎯⎯⎯ 16-1
⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ $\overline{1220}$

Pay To The
    Order of _____ $_____

_____ Dollars

                                    _____ "

Attached to that form, when he so presented it, was a piece of paper upon which there was penciled printing, in part, as follows: "Aircraft Sales Corp." and "Demco Research & Manufacturing Corp." Below each of said names, just

quoted, there were words and figures which purported to be the addresses and telephone numbers of those alleged corporations. He ordered the printing of 100 checks, similar in form to the blank check he presented to the printer, which checks were to bear, at the top thereof, the words "Aircraft Sales Corp." and the additional writing shown on the memorandum purporting to be the address and telephone number of that corporation. He also ordered that the name of said corporation be printed under the signature line of the checks. He also ordered the printing of another 100 checks in the same form as the 100 checks just referred to, except that said additional checks were to bear the words "Demco Research & Mfg. Corp." and the additional writing shown on the memorandum purporting to be the address and telephone number of that corporation. He also ordered the printing of 10 cards, purporting to be identification cards which were to bear, at the top thereof, the words "Aircraft Sales Corp."; and he ordered the printing of another 10 cards in the same form which were to bear the words "Demco Research & Mfg. Corp." The printing on those cards was to include a blank form for use in stating the name, sex, height, date of birth, and other information for identification purposes. When he was presenting the order for the printing he showed the printer a folder regarding "Philco televisions" and he also showed him his "television setup" and "maps laying out some kind of arrangement" for television. He told the printer that he needed letterheads, envelopes, cards "and so forth." The printer printed the checks and cards as ordered and delivered them to defendant when he called for them on the following day, February 9th. Defendant delivered the checks and cards to Jack Rouse at the Gates Hotel about noon on February 9th.

Norman Rouse and one D'Acquisto, who are codefendants herein, and Jack Rouse (not a defendant herein) filled in the blanks on five of the printed check forms (except the signature blank). They wrote the fictitious names, "Ted E. Green" and "John T. Stone," therein as payees. D'Acquisto signed a fictitious name, "Carl Hudson," on the five checks as the drawer thereof. During the evening of February 9th, Norman Rouse and Jack Rouse, representing themselves to be the said payees, cashed the five checks at various stores. For the purposes of identification, while they were endeavoring to cash the checks, they presented to the store proprietors identification cards which were some of the printed identifi-

cation cards that had been filled in with fictitious names and information. There was no checking account, or credit arrangement, at the Farmers and Merchants National Bank of Los Angeles for Aircraft Sales Corp. or Demco Research and Mfg. Corp.

On February 11, 1952, two police officers arrested Jack and Norman Rouse and Patricia Wilson (a codefendant) in a room at the Gates Hotel. The officers found therein, in a suitcase belonging to Jack Rouse, blank checks bearing the names ''Aircraft Sales Corp.'' and ''Demco Research & Mfg. Corp.'' They also found in the room a check-writing device. Officer Baucum testified that he and Officer Stockwell had a conversation with Jack and Norman Rouse, D'Acquisto, and defendant Etie on February 26, 1952, at a police station; that the statements of said persons were made freely and voluntarily; that Jack Rouse said: he had ''contacted'' defendant Etie and D'Acquisto relative to obtaining the name of a printer who would print checks; they (Jack and Norman Rouse) had made an agreement with Etie to obtain 200 checks for $200; the form for use in printing the checks, for the Aircraft Sales Corp. and the Demco Research and Mfg. Corp., was given to Etie who took it to a printer; Etie delivered the printed checks to Jack and Norman Rouse and D'Acquisto at the Gates Hotel about noon on February 9th; they (the Rouses and D'Acquisto) proceeded to write the checks and used a check-writer for the amounts; D'Acquisto signed all the checks, using the name Carl Hudson on the Aircraft checks and the name Wm. H. Welch on the Demco checks; Jack and Norman Rouse then (in the evening of February 9th) proceeded to cash the checks; Jack and Norman Rouse, while accompanied by Patricia Wilson, met Etie that evening in the parking lot of the Cockatoo Restaurant at Imperial and Hawthorne Boulevards; Etie then followed them to a place on Mansel Street just south of Imperial Boulevard; Jack Rouse gave Etie $200 in cash and several articles of food and some whiskey; Jack and Norman Rouse cashed the checks, and they intended to go to New Orleans with the proceeds. The officer also testified that, in said conversation, Etie said that: he had gone to the printer and made a ''contact'' with him to print the checks; the checks were delivered to him and he gave them to Jack and Norman Rouse in the hotel room at the Gates Hotel; he received $200 in cash, several fifths of whiskey and some groceries for delivering the checks; he also secured the identifi-

cation cards from the printer. The officer testified further that when a statement was obtained, during that conversation, which implicated another defendant, the one who was implicated thereby was asked if the statement was true, and that person replied that it was true.

Defendant testified that Jack Rouse called him by telephone on February 7, 1952, and asked him to come to the Gates Hotel; defendant went to Rouse's room in the hotel on February 8th (Friday) and saw Jack and Norman Rouse there; defendant and Jack Rouse had become good friends in prison where they worked together on a newspaper and were cellmates; Jack Rouse told defendant that he had an interest in a gambling spot in Stockton, he planned to leave on Sunday, and he had a million things to do before Sunday; Rouse asked defendant if he would be interested in doing a favor for Rouse and also making a few dollars for himself; defendant replied in the affirmative, and Rouse said that he had to have some money "now" and that he had "this thing all arranged with another party but I understand that the printing cannot be done until next week, I have to leave Sunday"; Rouse also said that he had the copy for the printing of checks and "if you can get that out between now and Saturday night, I'll pay you $200.00"; defendant asked him what he was going to do with the checks, and he replied. "It is none of your business as far as this is concerned, I don't choose to tell you anything. I have offered you a straight business deal, if you can do it, fine; if you can't do it, let's just forget about the deal and if you can take this copy and deliver the printing to me by Saturday night, I can pay you $200.00, and let me know now, do you want to do that or do you not?"; defendant replied that he would do it; then Rouse handed him an envelope with several pieces of paper in it; he went to a printing shop where he had done a lot of business, and told the printer that the deal "is a rush and you print these checks up and have them ready tomorrow"; the printer said that he would finish the checks that night (Friday); defendant returned to the shop at noon the next day, received the printing and then delivered it to Jack Rouse at the hotel; Rouse told him that he did not have the $200, but he would give it to him that night at 9 o'clock at the Cockatoo Restaurant; defendant met him there and received the $200, some food and whiskey; he did not put any handwriting on any of the checks or identification cards; he did not see anyone place handwriting or typewriting on any of the checks

or identification cards; he was not present when any check was cashed. Defendant testified further that in his first conversation with Rouse nothing was said about identification cards; the copy for the identification cards was in the envelope which Rouse handed to him but he did not look at the contents of the envelope until he arrived at the printing shop; defendant assumed that the charge for printing the checks would be $30 or $35—he had allowed up to $50 for the job, but the printing of the identification cards was not included in that estimate; in 1934 and 1936 he was convicted of issuing checks without sufficient funds, and in 1936 and 1938 he was convicted of forgery.

Section 31 of the Penal Code provides: "All persons concerned in the commission of a crime. . . . whether they directly commit the act constituting the offense, or aid and abet in its commission, . . . are principals in any crime so committed." It is clear that defendant aided in the forgeries. ■ The word "aid" means "to assist, 'to supplement the efforts of another.' " (*People* v. *Bond,* 13 Cal.App. 175, 185 [109 P. 150].) "The word 'aid' does not imply guilty knowledge or felonious intent, whereas the definition of the word 'abet' includes knowledge of the wrongful purpose of the perpetrator and counsel and encouragement in the crime." (*People* v. *Dole,* 122 Cal. 486, 492 [55 P. 581, 68 Am.St.Rep. 50].) "To 'abet' another in the commission of a crime implies a consciousness of guilt in instigating, encouraging, promoting or aiding the commission of such criminal offense." (*People* v. *Best,* 43 Cal.App. 2d 100, 105 [110 P.2d 504].) ■ An aider and abettor is "guilty only to the extent (1) of his knowledge, or (2) of the natural and reasonable consequences of the acts which he aided or encouraged." (*People* v. *Beltran,* 94 Cal.App.2d 197, 205-206 [210 P.2d 238].) ■ "Whether the act committed was the natural and probable consequence and the extent of the defendant's knowledge are questions of fact for the jury." (*People* v. *Beltran, supra,* 206.) ■ The evidence supports a finding that defendant was an abettor, and that he had knowledge of the criminal purpose for which the checks were to be used. He knew that Jack Rouse, who had been his cellmate in the penitentiary and who ordered the checks printed as a "rush" order, had to have money "now," that is, at the time he was agreeing to pay Etie $200 for 200 printed checks. Rouse refused to tell him what he was going to do with the checks. He knew that if Rouse did not have any money there was no urgent and legitimate need for

printed checks or any checks. The offer to pay $1.00 per check for merely placing an order to print 200 checks was exorbitantly disproportionate to the reasonable value of such service. At the time when Rouse was in a rush to obtain printed checks bearing names, addresses and telephone numbers of a sales corporation and a manufacturing corporation in Los Angeles, and to obtain several identification cards bearing the names of the same corporations, he did not have any money or business other than an alleged interest in a gambling place in Stockton. Etie made false representations to the printer to the effect that the checks and identification cards were to be used by him in his alleged television business.

The judgment is affirmed.

Shinn, P. J., and Vallée, J., concurred.