[Crim. No. 2336.   Fourth Dist., Div. Two.   June 15, 1966.]

THE PEOPLE, Plaintiff and Respondent, v. MICHAEL MADISON, Defendant and Appellant.

Hamilton & Mueller and Gilbert N. Mueller for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Robert P. Samoian, Deputy Attorney General, for Plaintiff and Respondent.

McCABE, P. J.—By an information filed in November 1964, the defendant was charged with a violation of section 192, subdivision 3(a) of the Penal Code in that the defendant, in the driving of a motor vehicle in the commission of an unlawful act, not amounting to a felony, with gross negligence, or in the commission of a lawful act which might produce death, in an unlawful manner and with gross negligence, did kill one Jerry Dale Kennedy (hereinafter called Kennedy).

A second count charged the defendant with a violation of Penal Code, section 187, which count was dismissed upon motion under section 995, Penal Code.

After his plea of not guilty and personally waiving a jury trial, he was found guilty, sentence was suspended and probation granted under specified terms and conditions. This appeal follows.

Prior to November 27, 1964, the defendant, then age 19, had known one Cheri Lilly, age 16, for a period of one and one-half years and had been dating her for approximately six months. During the day of November 27, the defendant learned that Cheri had a date that evening with Kennedy. The defendant, during the evening of that day, was, on several occasions, heard to declare he was going to go to Miss Lilly's home and "kick Jerry Kennedy's ass." These declarations were made at a party at the defendant's aunt's home during the course of which alcoholic beverages were served. One witness recalled that the defendant had stated, "I'll kill the guy," or something of similar purport. At approximately 11 p.m. on that evening, the defendant asked his 16-year-old friend, Covey, if he (the friend) would drive the defendant to Cheri's home so that the defendant could talk to her. Covey consented and the defendant left his aunt's house at 11:30 p.m. in Covey's car with Covey driving. At this time the defendant evidenced no sign of anger. During all subsequent events the friend, Covey, was driving. Six other minors ranging from age 14 to 19 were passengers in the car; however, one of the passengers, a girl, was transported to her home. The car then proceeded to Cheri's residence arriving at approximately midnight. Upon arriving at Cheri's home, the car was parked, facing north, across the street from the house. Parked one house down from Cheri's residence, facing south, was another car containing four minors who had attended the party described above. Of the four, one was a female and one was defendant's brother. Defendant left the Covey car, spoke to the occupants of the other auto and as he was returning to the Covey car a Volkswagen stopped in front of Cheri's home.

Defendant approached the rear of the parked Volkswagen. As defendant neared the rear of the Volkswagen, its driver, Kennedy, became aware of defendant's presence. The Volkswagen vehicle accelerated rapidly down the street in a southerly direction. Someone in the Covey car shouted, "Let's follow them." Both of the waiting cars started to pursue the Volkswagen. The Covey car had some difficulty joining the pursuit for it had been facing the opposite direction.

At the end of the block the Volkswagen ran a stop sign and turned left. The chase lasted some 15 to 20 minutes, winding through a residential area at speeds of from 30 to 40 miles per hour. All three cars disregarded stop signs and the posted speed limits. The driver of the Volkswagen, Kennedy, drove recklessly, sometimes on the wrong side of the street, allowing the Volkswagen to "fishtail" around corners. At one or more times during this chase, defendant, who was sitting at the far right hand side of the front seat, exclaimed, "Get him, Bill," [Covey's first name] and "Don't lose him, Bill," or words of similar purport. All of the occupants of the car admittedly made similar exclamations. The Covey vehicle eventually caught up to and closely followed the Volkswagen. While passing through an intersection, the Volkswagen slowed suddenly, and the pursuing auto swung to the left to avoid striking it from the rear. The Volkswagen then swerved to the left. The two autos came into brief contact along their sides, then parted with the Covey car pulling ahead. The Volkswagen then passed the Covey car on the left and the driver "hit his brakes" several times. On the last occasion this occurred, there is evidence the Covey vehicle struck the Volkswagen from the rear. Shortly after this the Volkswagen swerved left sharply toward the curb, and struck it. While making this sudden turn, the Volkswagen left two turning skid marks approximately 60 feet long. The Volkswagen jumped the curb and overturned in the front yard of a residence. After the Volkswagen had crashed, defendant exclaimed, "Cheri," and told Covey to stop. The occupants of the pursuing car left their car and ascertained that Kennedy was very seriously injured or dead. Admittedly, Kennedy died as a result of the accident. Defendant found Cheri and discovered she was still alive. When informed Kennedy was dead and before law enforcement officers had arrived at the scene, he exclaimed, "I have killed him; I have killed him."

The defendant and two friends were taken to the Newport Beach police station at approximately 2 o'clock on

the morning of November 28, 1964. There is a conflict in the testimony as to whether at that time they were advised of their constitutional rights. After this, the defendant in a conversation with his friends admitted fault for the incident. This statement was not elicited by any questions put to defendant by the officer but was overheard by that officer. Defendant and his companions were asked to "explain the night from the beginning as to what happened." Prior to his arrest, a written statement was given by the defendant which was subsequently introduced in evidence. The interrogating officer, during the preparation of these statements, admittedly directed that the defendant delete the phrase, "Kick his ass," and change it to, "Stomp his butt." There is a conflict in evidence as to exact deletion and insertion requested by the officer. The defendant's counsel moved to strike all of the defendant's admissions of liability made at the scene of the accident, presumably on *Dorado* grounds. (*People* v. *Dorado,* 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361].) However, the court held that the investigation had not then focused on the defendant and hence those statements were admissible, under *Dorado, supra,* and its progeny.

The defendant did not object to the admission of the written statement and the admission of fault made in the presence of the interrogating officer. After the second *Dorado* decision, *supra,* if defendant fails to object to the admission of such evidence, the objection cannot be raised for the first time on appeal. (*People* v. *Brown,* 238 Cal.App.2d 924 [48 Cal.Rptr. 204].)

Defendant contends that the only theory upon which he can be convicted of a violation of section 192, subdivision 3(a), Penal Code, is as an aider and abettor to the manslaughter because he was not the owner or driver or in control of the driver of the car. From this postulation he concludes the evidence was insufficient to support the judgment. Further defendant contends that as a prerequisite for the establishment of the corpus delicti of the charged crime under the statute section, it must be shown the defendant was the "driver" of the vehicle which directly or indirectly caused the fatal injury.[1] During the trial, Covey, the driver of the

[1]Penal Code, section 192, subdivision 3(a):
"Manslaughter is the unlawful killing of a human being
"3. In the *driving* of a vehicle
"(a) In the commission of an unlawful act, not amounting to a felony with gross negligence; or in the commission of a lawful act which might produce death, in an unlawful manner, and with gross negligence."

auto, testified that he would have obeyed any direction which the defendant might have made and in fact he did stop the car when the defendant directed him to do so. He contends, therefore, that the statute (Pen. Code, § 192, subd. 3(a)) does not apply to him as the term "driver" is defined by Vehicle Code, section 305, to be ". . . a person who drives or who is in actual physical control of a vehicle." This definition has been more broadly interpreted.

There are numerous cases which have found violations of the so-called "hit and run" statute, Vehicle Code, section 20001,[2] by persons other than the actual driver of a vehicle where it is shown that this person had control over the operation of the car and committed some act at the time of the accident to encourage the actual driver to leave the scene of the accident.

In *People* v. *Holford,* 63 Cal.2d 74 [45 Cal.Rptr. 167, 403 P.2d 423], a passenger in an automobile was admittedly aware that his vehicle had sideswiped another car causing it to crash and, since all occupants had been drinking, advised the driver to leave the scene to avoid liability. In *Holford,* the Supreme Court held a passenger "who advises and encourages the commission of the crime, while present at its perpetration, surely falls within the definition of a principal." See also *People* v. *Odom,* 19 Cal.App.2d 641 [66 P.2d 206]; *People* v. *Rallo,* 119 Cal.App. 393, 397 [6 P.2d 516]; *People* v. *Steele,* 100 Cal.App. 639 [280 P. 999]; *People* v. *Maggio,* 90 Cal.App. 683 [266 P. 813].

Stated in an alternative manner, a passenger may be liable for a violation of this section 20001, Vehicle Code, if he exercises control or has the right to control the operation of the vehicle and advises or encourages the actual driver to leave the scene—to commit the crime. Analogously, a defendant may be held for a violation of Penal Code, section 192, subdivision 3(a), although he is not in physical control of the vehicle.

Penal Code, section 31, defines principals as "All persons concerned in the commission of a crime, . . . [who] aid and abet in its commission." One may aid and abet the commission of a crime without previously entering a conspiracy to commit it. (*People* v. *Villa,* 156 Cal.App.2d 128, 134

---

[2]Vehicle Code, section 20001:
"The *driver* of any vehicle involved in an accident resulting in an injury to any person shall immediately stop the vehicle at the scene of the accident. . . . and any person failing to stop or to comply with the requirement under such circumstances is guilty of a public offense. . . ."

[318 P.2d 828] ; *People* v. *Turner,* 86 Cal.App.2d 791, 802 [195 P.2d 809].) The test of an aider and abettor is whether he in any way, directly or indirectly, aids the perpetrator by acts or encourages him by words or gestures in the commission of the crime. (*People* v. *Villa, supra,* 156 Cal.App.2d 128, 134; *People* v. *Fleming,* 191 Cal.App.2d 163, 168 [12 Cal.Rptr. 530].) ▮ Yet essential to a conviction of a violation of Penal Code, section 192, subdivision 3(a), is a proof of criminal negligence. (*People* v. *Hurley,* 13 Cal.App.2d 208, 213 [56 P.2d 978].) Criminal negligence has been held to consist of a measure of wantonness or flagrant or reckless disregard for the safety of others, or wilful indifference, to their safety. (*People* v. *Driggs,* 111 Cal.App. 42, 47 [295 P. 51] ; *People* v. *Wilson,* 193 Cal. 512 [226 P. 5].)

Gross negligence is now defined to be ''an entire failure to exercise care, or the exercise of so slight a degree of care as to justify the belief that there was an indifference to the things and welfare of others.'' (*People* v. *Costa,* 40 Cal.2d 160, 166 [252 P.2d 1].)

▮ In the instant case the inferential finding of the court was that the driver's conduct amounted to gross negligence under the definition in the *Costa* case. The Attorney General contends the defendant should be convicted of the same crime as a principal for he ''aided and abetted'' the driver.

The presence of the accused at the scene of a crime is not sufficient to make him a participant, *People* v. *Mauldin,* 181 Cal.App.2d 184, 189 [5 Cal.Rptr. 243] ; *People* v. *Lee,* 202 Cal.App.2d 36, 40 [20 Cal.Rptr. 360], although it is a circumstance from which his participation in the criminal intent may be inferred. (*People* v. *Moore,* 120 Cal.App.2d 303, 306 [260 P.2d 1011].) Nor is he guilty as a principal because he fails to act to prevent it. (*People* v. *Mauldin, supra*; *People* v. *Carlson,* 177 Cal.App.2d 201, 205 [2 Cal.Rptr. 117] ; *People* v. *Stadnick,* 207 Cal.App.2d 767, 771 [25 Cal.Rptr. 30, 99 A.L.R.2d 766].) However, the evidence must show not only that he aided and assisted in the doing of the illegal act, but that he abetted the actor—that he aided the actor with guilty knowledge or intention. (*People* v. *Green,* 96 Cal.App.2d 283, 290 [215 P.2d 127] ; *People* v. *Allen,* 208 Cal.App.2d 537, 541 [25 Cal.Rptr. 351] ; *People* v. *Aguilar,* 174 Cal.App.2d 662, 666 [344 P.2d 880].)

In *People* v. *Kemp,* 150 Cal.App.2d 654 [310 P.2d 680], in a factual setting almost akin to that of the instant case the court held that the conviction under this precise Penal Code section

should be sustained where it was shown the defendant and the codefendant had encouraged each other to drive their automobiles in a race at a fast and reckless speed on a residential street, and as they approached a blind intersection the codefendant struck an automobile in the intersection, killing a passenger therein.

In the instant case the testimony of the driver and others indicated that the defendant exclaimed, "Get them," and made other remarks of a hostile nature earlier that day. His actions were sufficient to constitute aid and encouragement; under the circumstances his lack of objection to the hazardous pursuit, fraught with peril to all of the participants amounted to an approval. (*People* v. *Villa, supra,* 156 Cal. App.2d 136; *People* v. *Mummert,* 57 Cal.App.2d 849, 855 [135 P.2d 665]; *People* v. *Lewis,* 113 Cal.App.2d 468 [248 P.2d 461].)

The defendant contends some affirmative act is necessary to constitute the aiding and abetting of a crime, and that the evidence discloses no such act. The defendant and eight younger males were present in front of Cheri's home and gave chase to the decedent when he appeared. During the ride, the defendant, although aware of the potential danger, affirmed his willingness to have the driver continue the pursuit. Finally after the victim's car had run off the road, the defendant acknowledged his guilty knowledge of the consequences of his actions by his exclamation at that time, "I have killed him, I have killed him." Defendant was aware of and encouraged the driver to pursue the victim in a manner which amounted to gross negligence in violation of numerous traffic ordinances. Not only is he guilty of a violation of these ordinances as an aider and abettor, the commission of which was contemplated by him, but also of the natural and reasonable or probable consequences of the acts which he knowingly encouraged. (*People* v. *Beltran,* 94 Cal.App.2d 197, 205-206 [210 P.2d 238]; *People* v. *Etie,* 119 Cal.App.2d 23, 28 [258 P.2d 1069]; *People* v. *Simpson,* 66 Cal.App.2d 319, 328 [152 P.2d 339].)

Judgment affirmed.

Kerrigan, J., and Tamura, J., concurred.