Ronnie **BIRMINGHAM** et al., Appellants,

v.

**COMMONWEALTH** of Kentucky, Appellee.

Court of Appeals of Kentucky.

May 26, 1972.

William E. Scent, Reed, Scent & Walton, Paducah, for appellants.

Ed W. Hancock, Atty. Gen., John C. Ryan, Sp. Asst. Atty. Gen., Frankfort, for appellee.

PALMORE, Judge.

Just before midnight on Saturday, February 7, 1970, Gary Latham and Beverly

Overby, passengers in an automobile driven by Steve Bell, were killed in a head-on collision near Fulton, Kentucky, between the Bell vehicle and an oncoming truck. Bell, who had been or was attempting to pass an automobile driven by Glen Dowden, was on the wrong side of the highway. The Hickman County grand jury indicted Bell on two counts of involuntary manslaughter in the first degree, and in a joint trial with the three defendants who are the appellants in this case he was convicted of involuntary manslaughter in the second degree under both counts. KRS 435.022(1) and (2).

For some time before the accident Bell had been following and harassing Dowden. At the moment of the fatal collision the appellants, James Williams, Ronnie Birmingham and E. C. Jackson, together with a young lady named Kathy Morey, all friends of Bell, were following behind at a distance of some four or five car lengths (though not on the wrong side of the highway), close enough for their vehicle to be struck by a piece of flying metal from the collision ahead. The grand jury indicted Williams, Birmingham and Jackson on a single count of aiding and abetting Bell in the first degree involuntary manslaughter of Latham and Miss Overby. Each of them was convicted of second degree involuntary manslaughter and sentenced to 12 months in jail, KRS 435.022(2), from which conviction they bring this appeal.

The arguments for reversal are that the appellants were entitled to a directed verdict of acquittal, the instructions were erroneous, and certain evidence was improperly admitted. Since we are of the opinion that the evidence was not sufficient to justify their conviction of involuntary manslaughter, only the first point requires extensive discussion.

As observed by counsel for the appellants, the case is most unusual, and there do not appear to be any helpful precedents. The basic question is, when one of a bunch of skylarking teenagers on three or four different sets of wheels has a fatal accident, to what extent are the others criminally responsible? The details are as follows:

Steve Bell, 18 years old, lived in Union City, Tennessee, not far from the Kentucky border. He had a 1969 model Plymouth Roadrunner automobile which was registered in his mother's name. At about 7:30 on a Saturday evening he drove to South Fulton, Tennessee, and "rode around a little bit." He ran across Gary Latham, a friend, at a service station. Gary got in the car and they rode around some more. At about 9:00 P.M. they chanced to meet Beverly Overby, who was driving around town in another automobile. Beverly, a student at the Martin, Tennessee, branch of the University of Tennessee was a friend of both Steve and Gary. She parked her car and joined them in Steve's automobile, whereupon the aimless journey resumed. Between 9:30 and 10:00 P.M. they stopped at a cold drink vending machine located on the premises of Puckett's service station in Fulton, Kentucky, at which time and place they first encountered Glen Dowden. (Fulton, Kentucky, and South Fulton, Tennessee, are separated by the Kentucky-Tennessee state line.)

Glen Dowden, 17 years of age, lived near Martin, Tennessee. On the evening in question he had his mother's 1965 model Chevrolet automobile. Accompanied by a neighborhood friend, Ronnie Jones, 19 years of age, he drove to Fulton, Kentucky. Around 9:00 P.M. at a dairy bar in Fulton they met two young girls named Glenda and Mary Minton, sisters, who lived near Water Valley, Kentucky, a community located on Highway 45 five miles or so north of Fulton. Glenda and Mary accepted their invitation to go riding. It was a rainy or misty night, and after a time Dowden drove into Puckett's service station to have his windshield cleaned. Bell's car was parked at the drink machine.

For no good reason other than boyish exuberance Dowden decided to run his car

back and forth across the bell cord at the service station, and in so doing he nearly ran into the Bell car as Bell started to back away from the drink machine. The boys in the respective automobiles did not know each other, but Bell and Latham were acquainted with the Minton girls. Misconstruing Dowden's act in nearly striking his car as having been deliberate, Bell took offense and pursued the Dowden car as it left the service station. As a result Dowden pulled off at a garage on the road to Water Valley and Bell stopped behind him, got out and asked Dowden why he had tried to run over him. Dowden denied having done so, but evidently Bell was not satisfied. Dowden then drove away and went back through Fulton into Tennessee, with Bell following. Dowden stopped at a shoe store by the highway and again Bell pulled up and got out of his car, this time with Latham. Bell and Latham tried to get Dowden out of his automobile but were unable to do so because the doors were locked. In the process, according to most of the witnesses, Bell kicked the Dowden car, whereupon Dowden pulled away and drove to the South Fulton city hall. Bell followed, and they arrived at about the same time. In fact, Bell beat Dowden to the door, and asked the police officer on duty what he could do about Dowden's having tried to run over him in Fulton. The officer replied to the effect that the matter was outside his jurisdiction and would have to be taken up with the authorities in Fulton. Meanwhile, outside the city hall, the Minton girls had convinced Latham that no offense had been intended at Puckett's service station, and when Bell came out Latham suggested that they forget about it. Bell, however, got the idea that Dowden was laughing at him, and attempted to get into a discussion with him, but Dowden re-entered his car, rolled the window up (grinning and laughing "smart-alecky-like," as Bell says), and drove away.

It was at this point that the first of the appellants, James Williams, entered the scene. Williams, 18 years of age, was a friend of Bell and Latham. He had a date with Kathy Morey, who was Beverly Overby's college roommate at Martin and was spending the week-end at Beverly's home in South Fulton. Kathy and Williams were riding around in Williams' station wagon and happened to notice Bell, Latham and Dowden in front of the South Fulton city hall. Bell appeared to be angry. This aroused Williams' curiosity, so after passing the city hall he turned his car around and headed back, but the Dowden and Bell cars were pulling away in the direction of Fulton as he returned, and he fell in behind the Bell car.

Dowden drove from the South Fulton city hall to a 4-lane bypass highway leading to Union City, Tennessee. He was followed by the Bell and Williams vehicles. By this time he was frightened, and at the suggestion of one of the Minton girls turned back onto the other side of the highway and drove to the police station in Fulton, Kentucky. According to Dowden, on the 4-lane highway the Bell car passed him twice, the Williams car was close by, and Bell slowed down almost to a stop while at the same time veering from side to side ("wobbling in the road") to prevent Dowden from passing.

The 3-car caravan broke up temporarily in Fulton. Beverly Overby had to get her family automobile home, so Bell took her to the place in South Fulton where she had parked it earlier and then picked her up at her home, from whence they drove to a Texaco service station in South Fulton. By coincidence (we suppose), Williams also drove to this same Texaco station. Meanwhile, on the way back into Fulton from the 4-lane highway Williams had seen the appellant E. C. Jackson, 18 years of age, driving a 1956 model Ford automobile and had motioned for him to follow. This is where the appellants Jackson and Ronnie Birmingham enter the picture. Birmingham was a passenger in Jackson's car. Jackson, a brother-in-law of Gary Latham, lived near Fulton. Birmingham

lived on the Tennessee side near South Fulton. Both were friends of Williams.

According to his own testimony Williams did not follow Dowden to the Fulton police station but turned off and went to the Texaco station in South Fulton. Some of the Commonwealth's witnesses, however, testified that both the Williams and Bell vehicles passed the Fulton police station while the Dowden group was there. Anyway, it is definite that Jackson drove on to the police station and got out and asked an officer what was going on. The officer suggested instead that Jackson tell him what was going on, after which Jackson and Birmingham departed and shortly arrived at the same Texaco service station in South Fulton to which the Bell and Williams cars had preceded them. Meanwhile, the police officer at Fulton led the Dowden car out of town by a back way and saw it safely en route to Water Valley, where the Minton girls lived.

At the Texaco station Bell told Williams that Dowden had tried to run into his car. There is a conflict in the evidence as to whether he gave the same information to Jackson and Birmingham, who were the last to arrive, whether they heard it from Williams, or whether they heard it at all, but suffice it to say that in spite of the innocent disavowals of the participants, on the basis of the circumstances it certainly would not have taxed the credulity of an intelligent jury to believe, as this jury no doubt did believe, that the Texaco meeting was in the nature of a rendezvous at which all hands were fully briefed and plans were made to bring Dowden to bay.

At the invitation of Williams, Jackson and Birmingham left Jackson's car and got into the Williams station wagon, Birmingham in the back seat and Jackson up front with Williams and Cathy Morey. The Bell vehicle departed toward Fulton and Williams followed until they reached a stop light at the railroad crossing in town, where Bell turned one way and Williams the other. Williams "went around town a

couple of times and headed out toward Water Valley." When he arrived at Water Valley he stopped and talked with two sisters of the Minton girls who were sitting in a parked car in front of an implement store. (Williams knew all of the Minton girls.) Meanwhile, Dowden and Jones had taken Glenda and Mary Minton to their home, which was located on a side road leading off Highway 45.

After a brief interval at the implement store Williams drove away and turned down the road on which the Mintons lived. As he passed the Minton house he and his passengers saw the Dowden car there. Williams went on down the road a short distance and turned around in time to follow the Dowden car out.

We need not detail the reasons (or nonreasons) Williams and his passengers gave for all these coincidental maneuvers, or the explanations offered by Bell for his actions, because the physical circumstances make the truth too obvious to be obscured by the testimony. So we continue with the overt facts.

Dowden had seen the Williams station wagon pass the Minton house and was aware that it was behind him as he drove back out toward Highway 45. He says that when he reached the intersection the Bell car was sitting there to his right, preventing his turning southward toward Fulton (Bell says he was driving northward on the highway when Dowden appeared unexpectedly), so Dowden bolted straight across the highway onto a gravel road which loops around and affords re-entry to the highway a short distance to the south. Bell immediately followed; Williams turned to the right on the highway and started into the lower or south end of the loop just as Dowden emerged with Bell close behind. According to Dowden, Williams was trying to block his escape but was unsuccessful, and Dowden was able to get by and head back toward Fulton on Highway 45. Moments later, some two or three miles down the highway, the fatal accident took place.

It was raining or misting. The road was a 2-lane paved highway with some hills and curves. Bell made several efforts to pass Dowden but Dowden obstructed his attempts to do so. As a matter of fact, as they reached the point of collision Bell's car was or had been partially over on the left-hand shoulder. The collision took place some 100 feet beyond and south of a yellow "no-passing" line marked for southbound traffic. Bell says he saw the oncoming truck when he started to pass. All the witnesses agree that the speed of the Dowden and Bell cars, and of the Williams car trailing along behind, was between 50 and 60 m. p. h.

It seems to us that the critical question in the case against Williams, Jackson, and Birmingham was raised when they objected to the instructions because they did not specify exactly what these defendants must have been aiding or encouraging Bell in doing in order to be found guilty. For example, the instruction under which they were convicted authorized a finding of guilty if Bell caused the death of Latham and Beverly Overby by the reckless operation of his automobile and Williams, Jackson and Birmingham "were present at the time and did aid, abet, advise, counsel or encourage the said Steve Bell who caused the death of Gary L. Latham and Beverly Overby," etc.

 We do not question that a person may be found guilty of aiding and abetting another person in the crime of involuntary manslaughter under KRS 435.022(1) or (2) by reckless or wanton conduct in the operation of an automobile. See, for example, People v. Madison, 242 Cal.App.2d 820, 51 Cal.Rptr. 851 (1966), in which the convicted accomplice was a passenger in the car and actively encouraged the driver in his criminally negligent operation of the vehicle. But the criminal act which these three appellants must have encouraged or abetted is the reckless conduct of Bell in driving his automobile. However indefensible it may have been, their responsibility for the hooliganism that preceded and led

up to this tragic accident cannot extend beyond the natural and probable consequences of the acts in which they participated or knowingly encouraged. 1 Wharton, Criminal Law and Procedure § 114 (12th ed. 1957).

 The specific conduct which precipitated the fatal accident was Bell's incredible foolhardiness in attempting to pass Dowden with an approaching vehicle in clear view ahead, knowing that Dowden was not going to let him pass if he could help it. This, we believe, was recklessness of a degree beyond the scope of that which was likely or expectable from the preceding events and circumstances. We do not mean to say that the appellants had no reason to foresee an accident, only that they had no reason to anticipate *this* accident, resulting, as it did, from a degree of recklessness beyond what could reasonably have been forecast on the basis of the preceding events.

The judgment is reversed.

All concur.