[Crim. No. 10115. In Bank. Apr. 2, 1970.]

THE PEOPLE, Plaintiff and Respondent, v.
HAROLD ROGER TERRY and JUANELDA ALLEN,
Defendants and Appellants.

## COUNSEL

Frederick E. Watson and Howard L. Schwartz, under appointments by the Supreme Court, for Defendants and Appellants.

Thomas C. Lynch, Attorney General, Albert W. Harris, Jr., Assistant Attorney General, Edward P. O'Brien and Michael J. Kelly, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**THE COURT.**—A jury found Harold Terry and Juanelda Allen guilty on two counts of first degree murder. Terry admitted a prior felony conviction of armed robbery. The jury fixed Terry's penalty at death on each count. Juanelda received life sentences because she was only 17 years old

at the time of the homicides (see Pen. Code, § 190.1). Terry's appeal is automatic (Pen. Code, § 1239, subd. (b)), and Juanelda's appeal has been consolidated therewith.

About 11 p.m. on February 2, 1965, Marshall Burnett was slain in the course of a robbery of his Oakland drugstore. He was shot four times and stabbed seventeen times with a pair of scissors. The robbers took cash and stamps worth about $700. Prints of a man's shoe and what appeared to be the print of the spike heel of a woman's shoe were found on papers scattered about the floor of the pharmacy. An employee testified these papers had not been on the floor two hours before the robbery when he had swept the store.

According to Terry's testimony, he and Juanelda left their apartment about an hour before the robbery and drove to the neighborhood of Burnett's pharmacy, which they planned to rob. The pair walked to the pharmacy and waited outside for 10 or 15 minutes until customers left. During this wait they planned the details of the robbery. They then entered the store, and, according to plan, Juanelda asked Burnett for some Dristan. Defendants knew Burnett would turn his back to them to get this item, and, while his back was turned, Terry drew his revolver and announced, "This is a stick-up." Terry then told Juanelda to turn out the store lights and close the front door, which she did. While Terry held his gun on Burnett, Juanelda rifled the cash register. Terry then told her to empty the safe, which she did, with the exception of a metal box which she was unable to remove. Terry pried this box out of the safe while Juanelda held the gun on Burnett. Terry then told Juanelda to get some adhesive tape. He took back his gun, and Juanelda found some tape and taped Burnett's hands behind his back. Terry took a pair of scissors and cut the tape, at which point Burnett broke free and lunged at Terry. As the two struggled together, Terry stabbed Burnett with the scissors and shot him several times. Defendants then left the store. Burnett was dead.

Juanelda's version of this episode differs from that of Terry only in that she denied that the pair had discussed a robbery while waiting in front of the pharmacy and denied she was aware that Terry planned a robbery until he drew his gun. She admitted that she held the gun on Burnett while Terry rifled the safe, but testified that she left the store before Terry killed Burnett.

The second homicide occurred about four weeks later, on February 28, 1965. Dick Leong, employee at an Oakland Safeway store, was killed by two bullets, one of which was fired directly into the back of his head. These bullets were fired from the same gun that was used to kill Burnett. Leong was murdered soon after he had closed up the Safeway store around mid-

night. The killing was observed by witnesses, one of whom observed that Leong's assailant was a Negro; another noticed a woman with a white sweater in the getaway car, which was described as light in color with one black front fender. Still another witness reported that the car's license plate number was BOR 228.

According to defendants, Terry and Juanelda left their apartment between 11 and 11:45 p.m. the night of the Leong killing and drove to the vicinity of the Safeway store. Terry testified that they had previously observed the Safeway store on several occasions while plotting the robbery and were familiar with Leong's routine in closing. They planned to wait until Leong had left the store, to prevent his leaving the area by deflating one of the tires on his car, and to force him at gunpoint to enter the store and open the safe. On the night of the killing they parked their car on a hill overlooking the store and a short time later drove close to the store. Terry got out of the car and told Juanelda to drive it up when he whistled. Terry deflated one of Leong's tires, but Leong started his car before noticing the flat. He then stopped while still in the Safeway parking lot and started to change the tire. Terry approached him with drawn gun and announced, "This is a stick-up." Terry then gave the prearranged whistle signal to Juanelda, and she drove the car along the street and stopped, blocking the entrance to the parking lot. Meanwhile Leong attempted to throw his lug wrench at Terry, but it slipped out of his hands. Leong fled. Terry fired a shot in the air in Leong's direction and gave chase. Leong ran behind defendants' car and into the street, shouting "Help." Terry ran up to the car and fired at Leong over the roof of the car. The shot felled Leong across the street. Terry then ran across the street and put a bullet into the back of Leong's head. He ran back to the car, jumped in, and Juanelda drove off.

Juanelda's account of this episode differed only slightly from Terry's. She denied planning with Terry to rob the store and said she did not know he planned a robbery until he began firing at Leong.

Police found and arrested defendants by tracing the license number supplied by the witness to the Leong killing. The number BOR 228 did not check out, but trying the letters BQR police found a car that matched the witness' description of the getaway care used at the Safeway store killing. This car was owned by one Charles Jones, at that time incarcerated in jail. One of the officers who eventually arrested defendants, Inspector Spence, learned from Berkeley police that Terry had possession of Jones' car in February 1965, the time of the homicides. This information came to the Berkeley police from a reliable informant, who also reported that Terry and Juanelda were living together. Spence also knew that police

ballistics tests showed the same gun had been used to kill both Leong and Burnett and that what appeared to be a woman's heel print indicated a female accomplice in the Burnett killing. Furthermore, Spence learned that Terry and a pregnant Negro woman had participated in a recent robbery of a home in Alamo, California, and that Juanelda had given birth to a child in an Oakland hospital in January 1965, shortly after the Alamo episode.

From Mosco Allen, Juanelda's estranged husband, authorities had also learned that Terry and Juanelda were cohabiting. Mr. Allen gave police a street address for the apartment house where the pair allegedly lived. When officers went to that address they observed parked in the carport of the apartment house an automobile which matched the description of the car used in the Leong homicide.

Spence and another officer arrested Terry near his apartment on March 4, 1965. They learned from Terry the room number of his apartment, went to it, and arrested Juanelda. The apartment was then searched by the officers, and several pieces of evidence were seized. Among those used against defendants at trial were a pair of men's shoes (the prints of which matched those found at Burnett's pharmacy), bullets of the same caliber as those used in both homicides, women's shoes which could have made the spike heel marks at the pharmacy and which were probably bloodstained, and a woman's coat, also bloodstained.

Defendants were jailed and eventually confessed. These confessions were used against them at trial.

Police obtained several guns used by Terry from the home of his estranged wife. One of these was the murder weapon.

The People also proved an attempt by Terry to escape from jail some six months after his arrest, while he was awaiting trial on the homicide charges. During this attempted escape Terry wielded and fired a revolver and stated to a policeman, "I have killed two men already. It doesn't make any difference to me if I kill you too."

Terry took the stand and fully admitted the robbery and killing of Burnett and the attempted robbery and killing of Leong. He testified that Juanelda planned these crimes with him and knowingly participated in their execution, and that she had knowingly participated with him in several other robberies and burglaries prior to the Burnett-Leong episodes.

Juanelda took the stand and admitted her involvement in both homicides, but she denied any knowledge that Terry planned a robbery—on either occasion—until the moment she observed him with his gun drawn.

She claimed she aided Terry in the Burnett robbery after he pulled his gun only out of fear that he might harm her if she didn't. On cross-examination she admitted her presence at the Alamo robbery. She claimed, however, that she did not know that Terry and his cohort planned the robbery there until they started loading their loot into the car. She knew then, however, that they had robbed to get the loot. She also admitted on cross-examination that she had bought bullets for Terry's gun after he had killed Burnett but prior to the Leong homicide.

A psychiatrist testified that Juanelda was immature and nonaggressive, and that she would "blindly follow" one whom she loved. Although she was not mentally ill, the psychiatrist believed that the reason Juanelda aided Terry in the two homicides was her love for and fear of him.

*Alleged Denial of Right to Trial by the Court*

Motions for a nonjury trial were denied, and defendants contend that the court thereby erred. Before the 1928 amendment to section 7 of article I of the state Constitution, trial by jury could not be waived in a felony case. (See *People* v. *Nakis,* 184 Cal. 105, 110 [193 P. 92]; *People* v. *Garcia,* 98 Cal.App. 702, 704 [277 P. 747].) ■ The section now provides in part: "A trial by jury may be waived in all criminal cases, by the consent of both parties, expressed in open court by the defendant and his counsel . . . ." The requirement of the "consent of both parties" means that the prosecuting attorney must consent to a waiver. (*People* v. *Spencer,* 170 Cal.App.2d 145, 149 [338 P.2d 484].) Our inquiry here is whether the prosecutor expressed his consent to a court trial. The transcript contains the following exchange:

"[Attorney for Juanelda]: On behalf of [Juanelda], [Juanelda] at this time desires to waive her rights to be tried by a jury, and to request a trial by the Court in this matter on her behalf.

"THE COURT: Mr. District Attorney?

"[The prosecutor]: If the defendant would personally join in that motion by counsel, which I anticipate he would expect, I would still indicate at this position the People would not join in any such waiver of jury, and would not consent to any such process."

The court then elicited from Juanelda her personal waiver of jury trial and asked counsel for Terry his position on the matter. A recess was taken so that Terry and his attorney could confer. Terry and his attorney then expressly waived jury trial. The court then said:

"What is the position of the District Attorney on the matter?

"[The prosecutor]: We have already made a statement in reference to [Juanelda]. We would—of course this is a matter for determination of all the parties, as well as the Court—we would submit it to the Court for determination in this matter."

The judge then denied the motions for nonjury trials.

■ What was meant by the statement "we would submit it to the Court"? If the prosecutor meant that he was committing the decision as to whether there should be a jury or nonjury trial to the determination of the judge, he was clearly wrong. The judge does not have to give his consent to a nonjury trial, nor can he overrule the consent of the defendant and prosecutor. Under the Constitution this determination is left to the "consent of both parties," and that means the defendant and the prosecutor. Section 7 of article I, quoted *supra,* does not require the concurrence of the court in this determination (*People* v. *Boulad,* 235 Cal.App.2d 118, 123 [45 Cal.Rptr. 104]). Anything said to the contrary in *People* v. *Eubanks,* 7 Cal.App.2d 588, 589 [46 P.2d 789], is disapproved.

■ But there was no error here. As we read the record we do not think that the prosecutor in using the word "submit" intended to withdraw his previously expressed objection to a nonjury trial. Rather, we think, the prosecutor used the word "submit" in its normal sense, that is, that he was asking the court to rule without further argument. (*MacDermot* v. *Grant,* 181 Cal. 332, 334 [184 P. 396]; *Jalof* v. *Robbins,* 19 Cal.2d 233, 235 [120 P.2d 19].)[1]

*Selection of Jurors*

Terry contends that under *Witherspoon* v. *Illinois,* 391 U.S. 510 [20 L.Ed.2d 776, 88 S.Ct. 1770], it was error to exclude for cause veniremen Bolla and Domato. ■ Although the instant trial preceded *Witherspoon,* that decision is applicable herein. (*Witherspoon* v. *Illinois, supra,* 391 U.S. at p. 523, fn. 22 [20 L.Ed. at p. 785].)

*Witherspoon* holds that "a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." (*Id.* at p. 522 [20 L.Ed. at pp. 784-785].) The court excepted from this ruling veniremen who "made unmistakably clear (1) that they would

---

[1]"No term of general use in the proceedings of this Court is perhaps more generally understood than the term 'submitted.' It means, that the parties leave it to the Chancellor to determine without argument." (*Ridgely* v. *Carey* (Md.) 4 Harr. & McH. 167, 174.) . .

*automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them . . . ." (*Id.* at p. 522, fn. 21 [20 L.Ed. at p. 785].)

The relevant *voir dire* examination of Mrs. Bolla is set forth in the footnote.[2] After she stated that she felt she would be unable to make a

---

[2]"THE COURT: Mrs. Bolla, did you hear the questions asked by the attorneys and myself and the answers given by the prospective jurors?

"THE JUROR: Yes. I did.

"THE COURT: If you were asked substantially the same questions, would your answers be substantially the same?

"THE JUROR: Well, not fully.

"THE COURT: In what way would they differ?

"THE JUROR: Well, it would depend on the verdict. I feel like I wouldn't be able to make a decision on the capital punishment, whether it is going to be capital punishment or not.

"THE COURT: You have got to analyze — we have to consider every possibility in this case and we have got to consider the possibility of a first degree murder conviction as far as the defendant, Terry, is concerned, and if that did occur, I am not intimating it will, then of necessity under the law the jury is going to have to determine the nature of the punishment.

"Now, the question is, whether you, if that did occur, whether you could under any circumstances come out with a death penalty verdict, dependant upon the testimony that was presented to you?

"THE JUROR: Well, I believe that my religious beliefs would say no.

"THE COURT: You feel religiously your beliefs are against that?

"THE JUROR: Yes.

"THE COURT: You may interrogate, gentlemen, if you wish, on that regard.

"EXAMINATION OF JUROR MARGARET M. BOLLA

"BY MR. STRELLIS [counsel for Terry]:

" . . . . . . . . . . . .

"Q. . . . first of all do you understand that the law of California declares no preference. In other words you will never be in a situation where the Judge will in effect tell you if you find that to A, B, and C, you should bring back a death penalty. I might add conversely you will never be in a situation where the Judge will tell you if you find C, D, and E you should bring back a penalty of life imprisonment.

"The law presupposes no preference whatsoever. Obviously there are a great many people who are conscientiously opposed to the taking of human life in the abstract, but what we are asking you today and the reason it is important is again rather self-obvious, is this: Could you listen to all of the evidence, and having heard all of the evidence, if in your own mind you felt that this was a proper case for a death penalty, and these are your standards, they are not mine, they are not Mr. Jensen's [the prosecutor's], they are not the Judge's, but if in your own mind it came to whatever set of standards you peculiarly and personally would set as a proper case for you to impose the death penalty, could you then carry out your conscience and impose it without telling us whether in any particular sort of an instance you would consider this to be a proper case or an improper case [*sic*]?

"A. I think it would be rather hard for me to.

" . . . . . . . . . . . .

"Q. — now, obviously this would not be an easy thing for a person to sit there and tell me that it would be an easy thing. It would seem to be a rather monstrous statement to make on the face of it.

"A. I —

"Q. All — all I am asking is even if you do it very reluctantly and even if you set

decision on capital punishment, the court inquired whether if Terry was convicted of first degree murder she could "under any circumstances" vote for the death penalty, and she replied, "Well, I believe my religious beliefs would say no." Defense counsel then, after explaining that the law declares no preference and that the judge would not tell her that if she found certain facts she should return the death penalty, asked in effect whether she could impose the death penalty if after she heard the evidence she felt on the basis of her own standards that it was a proper case for the death penalty, and she replied, "I think it would be rather hard for me to." This response, if considered by itself, left open the possibility that she could under some circumstances return a death penalty, but that possibility was eliminated when defense counsel continued his questioning and asked in effect whether she could return the death penalty if she felt that it was the proper thing to do even if she did so with great reluctance, and she replied, "I don't think I could."

When viewed as a whole, her responses thus made it unmistakably clear that she would automatically vote against the death penalty and would do so irrespective of the evidence presented. Her final answer, in the context of the question asked, is substantially similar to the answer "I believe so" in response to the question whether the venireman would be unable to return a verdict imposing the death penalty regardless of the evidence, and the latter colloquy satisfies the constitutional standards enunciated in *Witherspoon*. (*People* v. *Floyd*, 1 Cal.3d 694 [83 Cal.Rptr. 608, 464 P.2d 64]; *People* v. *Hill*, 70 Cal.2d 678, 701 fn. 3 [76 Cal.Rptr. 225, 452 P.2d 329]; cf. *People* v. *Tolbert*, 70 Cal.2d 790, 809 [76 Cal.Rptr. 445, 452 P.2d 661].)

This is not a case where the venireman answered "I don't think so" in reply to the question "if he could impose the death penalty." In such a context the answer has been regarded as ambiguous. (*People* v. *Chacon*, 69 Cal.2d 765, 772-773 [73 Cal.Rptr. 10, 447 P.2d 106]; see also *People* v. *Osuna*, 70 Cal.2d 759, 768-769 [76 Cal.Rptr. 462, 452 P.2d 678].) Nor is this a case where the venireman answered "Well, I don't think I could send anyone to death" in reply to the question whether she had any opinion "one way or the other as far as the penalty." (*In re Hillery*, 71

---

very high standards before you would decide that this is a situation which you would take a human life, could you if you felt in your own mind and your own conscience that it was the proper thing to do in a particular case, and albeit that it would be an action that would be taken with great reluctance, could you return a death penalty?
"A. I don't think I could.
"MR. STRELLIS: I have no further questions.
"MR. JENSEN [the prosecutor]: I would submit a challenge for cause.
"THE COURT: All right. the juror is excused for cause. Thank you very much."

Cal.2d 857, 863 [79 Cal.Rptr. 733, 457 P.2d 565].) The majority in *Hillery* stated that because the answer occurred in the context of the foregoing question the answer could not reasonably be construed as indicative of anything more than tentative doubts as to the venireman's present willingness and ability to impose the death penalty. This case also differs from *People* v. *Vaughn,* 71 Cal.2d 406, 412-416 [78 Cal.Rptr. 186, 455 P.2d 122]. There under the majority position the veniremen who were held to have been improperly excluded were unable to predict how they would vote in any case whatever. Here venireman Bolla was able to make such a prediction.

■ Venireman Domoto's relevant *voir dire* is set forth in the footnote.[3] After he indicated his opposition to capital punishment, he was asked, "Is your opinion such that *regardless of what the circumstances were that will be proven to you in this courtroom* that you would not return a verdict which would impose a death penalty?" (italics added), and he replied, "I would not return a verdict—I would not return a verdict of the death penalty, even though the facts, in my mind, said that the party was guilty." The quoted response, in the light of the question asked, made it unmistakably clear that irrespective of the evidence that would be presented he would not return a death penalty. Accordingly, it was not error under *Witherspoon* to exclude him for cause.

Several additional veniremen were excluded for cause on the basis of their opposition to capital punishment. No claim is made that under *Witherspoon* it was error to exclude them, and from our review of the

---

[3]Mr. Domoto was examined as follows:

"Q. [by the prosecutor] Is the nature of the case such, being a charge of murder, one that would make it difficult for you to serve as a trial juror in any respect?

"A. I believe so.

"Q. Well, do you think that you could try this case just as you would any other case and make your decision based upon the law and the facts?

"A. As far as the facts are concerned I think that I could, excepting the last matter, except for the last point when it would come to capital punishment.

"Q. All right. Then, Mr. Domoto, in reference to that prospective service as a juror in the penalty phase of this trial, do you have personally an opinion which is in opposition to capital punishment?

"A. Yes, sir, I do.

"Q. Is your opinion such that regardless of what the circumstances were that will be proven to you in this courtroom that you.would not return a verdict which would impose a death penalty?

"A. I would not return a verdict — I would not return a verdict of the death penalty, even though the facts, in my mind, said that the party was guilty."

The prosecutor thereupon made a challenge for cause. Terry's counsel stated "we would submit it . . . without further interrogation," and the court allowed the challenge.

record we are satisfied that it was not error to exclude them because they also came within the excepted group.

Terry also contends that exclusion for cause of veniremen on the ground of their opposition to capital punishment denied him his right to a fair and impartial jury representing a cross section of the community at the *guilt* phase of his trial. ■ However, in the absence of persuasive documentation we must agree with the United States Supreme Court that "We . . . cannot conclude, either on the basis of the record now before us or as a matter of judicial notice, that the exclusion of jurors opposed to capital punishment results in an unrepresentative jury on the issue of guilt or substantially increases the risk of conviction." (See also *In re Eli*, 71 Cal.2d 214, 218 [77 Cal.Rptr. 665, 454 P.2d 337]; *People* v. *Gonzales*, 66 Cal.2d 482, 497-499 [58 Cal.Rptr. 361, 426 P.2d 929].)

## *Dorado Problems (People* v. *Dorado, 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361])*

■ Terry contends that evidence seized in the search of his apartment at the time of Juanelda's arrest was inadmissible as the poisonous fruit of information officers elicited from him prior to warning him of his rights to remain silent and to have counsel. (*People* v. *Buchanan*, 63 Cal.2d 880, 887 [48 Cal.Rptr. 733, 409 P.2d 957].)

After Terry was arrested on the sidewalk near his apartment building, police asked him one question before advising him of his constitutional rights pursuant to *Dorado*. That question was in what apartment in the building did Terry live. Apparently Terry told the police, for they went immediately thereafter to the proper apartment, arrested Juanelda, and made their search.

The People contend that the single question to Terry was not " 'a process of interrogations that lends itself to eliciting incriminating statements' "[4] (*People* v. *Stewart*, 62 Cal.2d 571, 579 [43 Cal.Rptr. 201, 400

---

[4]It is argued by Terry that the police questioning about which apartment he lived in, under *Miranda* (*Miranda* v. *Arizona*, 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]), should have been preceded by the giving of admonitions of his right to silence and to counsel. He contends that *Miranda* has given *Escobedo* (*Escobedo* v. *Illinois*, 378 U.S. 478 [12 L.Ed.2d 977, 84 S.Ct. 1758]) new meaning and that, although the test of a "process of interrogations that lends itself to eliciting incriminating statements" was announced in *Escobedo* (*supra*, 378 U.S. 478, 491 [12 L.Ed.2d 977,986]), it should no longer be applied. He urges that *all* questioning after an arrest must be prefaced by the admonitions, whether or not it be a process of interrogations. Whether *Miranda* is capable of that interpretation we need not now consider because *Escobedo* and *Dorado* are here applicable, not *Miranda*. (*People* v.

P.2d 97], affd. *sub nom. Miranda* v. *Arizona,* 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]). This contention is correct. ■ In determining whether questioning constitutes a process of interrogations, we must "analyze the total situation which envelops the questioning by considering such factors as the length of the interrogation, the place and time of the interrogation, the nature of the questions, the conduct of the police and all other relevant circumstances." (*People* v. *Stewart, supra,* 62 Cal.2d 571, 579.) ■ In the instant case police asked but a single question, immediately after arrest, in the very spot where the arrest was made. The question was not "inquisitorial," "intimidating," or "accusatory." (*People* v. *Treloar,* 64 Cal.2d 141, 147 [49 Cal.Rptr. 100, 410 P.2d 620].) Rather than tending to elicit incriminating statements, the question patently sought a form of identification from Terry. Police have a justifiable interest in asking persons they arrest to identify themselves. (See Graham, *What Is "Custodial Interrogation?": California's Anticipatory Application of Miranda* v. *Arizona* (1966) 14 U.C.L.A.L.Rev. 59, 105.) Asking an arrestee his name and address is simply making a "justifiable type of routine" inquiry. (*People* v. *Jaquish,* 244 Cal.App.2d 444, 449 [53 Cal.Rptr. 123] [overruled on another issue in *People* v. *Rivers,* 66 Cal.2d 1000, 1005 (59 Cal.Rptr. 851, 429 P.2d 171)]; see also *People* v. *Cotter,* 63 Cal.2d 386, 393 [46 Cal.Rptr. 622, 405 P.2d 862], vacated, 386 U.S. 274 [18 L.Ed.2d 43, 87 S.Ct. 1035]; *People* v. *Pike,* 239 Cal.App.2d 237, 242 [48 Cal.Rptr. 575].)

■ It should also be mentioned that Terry *did not* object at trial, on poisonous fruit grounds or any other basis, when the evidence seized at the apartment was admitted against him. Since the trial was conducted several months after our final opinion in *Dorado* was published, a timely objection was necessary to preserve the issue for appeal. (See *People* v. *Doherty,* 67 Cal.2d 9, 14 [59 Cal.Rptr. 857, 429 P.2d 177].)

Juanelda did make a timely *Dorado* objection to the receipt of her confessions, and we are required, therefore, to decide her *Dorado* contention on the merits. ■ She contends that the warning given her was insufficient[5] in that the arresting officer told her that she was entitled to an

---

*Rollins,* 65 Cal.2d 681 [56 Cal.Rptr. 293, 423 P.2d 221].) Under the law applicable here, there was no error if the police did not engage in a process of interrogations which tended to elicit incriminating replies. (*People* v. *Stewart,* 62 Cal.2d 571, 577 [43 Cal.Rptr. 201, 400 P.2d 97].)

[5]There are several places in the record where the police asked Juanelda if she had been warned of "her right to an attorney," but only in one place does the specific language used appear. The arresting officer testified "I then said, 'Juanelda, you realize, of course, that we are police officers,' and I showed her my star at this time, 'and that you are in very serious trouble, and there are a number of questions that we want to ask you. However, you should first know that you do not have to answer any questions that we or anyone else ask you, and that if you do want to answer the

attorney if she desired to answer the questions, and she contends that she was entitled to an attorney whether or not she desired to answer questions. But Juanelda in her testimony demonstrated that she did not interpret the warning in this restricted fashion. She testified "He [the arresting officer] . . . asked me did I know that I had a right to an attorney, and I didn't have to say anything unless I wanted to." When asked "And you knew you had a right to an attorney, didn't you?" she replied "Yes." A simple warning that you have "the right to an attorney" is sufficient to comply with the mandate of *Escobedo*. (*People* v. *Thomas,* 65 Cal.2d 698, 704 [56 Cal.Rptr. 305, 423 P.2d 233] [cert. den. 389 U.S. 868 (19 L.Ed.2d 143, 88 S.Ct. 140)].)[6] That is substantially what was done here.

██ Juanelda also contends that because of her immaturity and ignorance of the seriousness of her predicament she could not have intelligently waived her privilege against self-incrimination. This argument is not now entitled to serious consideration. It is based largely on the contention that as a minor and because of her immaturity she was unable to make a valid waiver. The majority of this court have held that a minor may validly waive his constitutional rights. (*People* v. *Lara,* 67 Cal.2d 365 [62 Cal.Rptr. 586, 432 P.2d 202] [cert. den. 392 U.S. 945 (20 L.Ed.2d 1407, 88 S.Ct. 2303)].) The rule of that case is controlling here.

### Aranda and Bruton Problems

██ Terry contends that extrajudicial confessions of Juanelda, in which Terry was implicated, were read to the jury at their joint trial in violation of *People* v. *Aranda,* 63 Cal.2d 518 [47 Cal.Rptr. 353, 407 P.2d 265]. He urges either that the confessions should not have been read, or he was entitled to a severance. *Aranda* was decided November 12, 1965. The trial in the instant case commenced November 16 but the attorneys and the court did not become aware of *Aranda* until December 6. The trial judge then was of the opinion that it was too late to sever the trial, and therefore attempted to comply with the mandate of *Aranda* by deleting from Juanelda's confessions all references to Terry.[7] The result was some-

questions you are entitled to have an attorney present, and furthermore, anything that you tell us, we will probably use against you later in a court of law. Do you understand this?' . . . Her response was, 'Yes, I understand.' "

[6]*Miranda* v. *Arizona, supra,* 384 U.S. 436, is inapplicable since the trial began before the date that decision was rendered. (*People* v. *Rollins, supra,* 65 Cal.2d 681, 683.)

[7]The court said: "[I]t is too late to do anything about it, permit a joint trial, and I have to go through these statements and see if I can effectively delete portions of them. . . . The prosecution in this case has intended from the beginning to offer in evidence and use these so-called extrajudicial statements, and at that time the motion for severance [made well before trial commenced] was denied, and I can't see and I would like the Supreme Court to point out to me at some future date how I can

what ridiculous. Juanelda's confessions were read to the jury practically in their entirety, but everywhere the name "Harold" (Terry) appeared, the word "deleted" was substituted. The jury was instructed not to consider what the "deleteds" replaced, nor why this had been done,[8] but it must have been obvious to everyone that "deleted" and Terry were one and the same.

For example, the statement read to the jury contained these questions and answers. "What time did you and deleted leave your apartment on East 15th? Answer: Between 11:15 and quarter to 12:00. . . . He said, 'Well, I'm going to the store. You want to go with me?' " Juanelda then told about going to the Safeway store and hearing gunshots. She was asked, "Did you think deleted was doing the shooting? Answer: When I saw him walk with this man I figured he was. Question: Well, I mean you must have some reason. Deleted was holding him up, or shooting him? Answer: Well, I have never seen him with any Caucasians at all, and when I heard the man [Leong] yell I knew something would happen." Later in the statement Juanelda said that she and he returned to the apartment house.

From this the jury knew that "deleted" was a male Negro who lived with Juanelda. The jury had previously learned from the testimony of police officers that Juanelda and Terry lived together on East 15th. The jury was bound to know that "deleted" must have been Terry. The Juanelda statements clearly implicated Terry and accused him of both the Leong and Burnett homicides. This was a clear violation of *Aranda.* In defining in *Aranda* when a statement can be used at a joint trial by making deletions to avoid implicating a codefendant, the opinion stated: "By effective deletions, we mean not only direct and indirect identifications of codefendants but any statements that could be employed against nondeclarant codefendants once their identity is otherwise established." (*People* v. *Aranda, supra,* 63 Cal.2d 518, 530.) In footnote 10 to the opinion it is indicated that effective deletions can best be made where no evidence outside the confession links the codefendants together at the time of the crime. But in

---

sever this trial at this time when we have gone now for about fifteen days of trial in this matter, how I can effectively sever the case for trial and try these two defendants separately. It is practically an impossibility and the Court in attempting to do it undoubtedly would commit error as far as either of these defendant's are concerned. . . . [I]f I could at this stage give separate trials to these two defendants, I would certainly do it to avoid any question. I can't possibly do that. We have to proceed with a joint trial."

[8]The court instructed: "These statements can be considered by you only as evidence against the defendant, Juanelda Allen, and cannot be considered by you for any purpose as evidence against the co-defendant, Harold Terry. For reasons of law certain portions of these statements have been deleted. The fact that such deletions have been made is not to be considered by you in your deliberations. You are not to speculate on what has been deleted nor as to the reasons for such deletions."

the instant case witnesses had already testified that a man and a woman were involved in both homicides. And Terry's confession related basically the same facts as Juanelda's and referred to both of them as being present.

 The Attorney General argues that *Aranda* is inapplicable because the judge did not have the alternative of granting separate trials and it would have been unfair to the People to exclude the confessions. He asserts that if the judge had granted a mistrial, so as to grant a severance, the double jeopardy rule would have barred further prosecutions of either defendant. This assertion is unsound. Before trial began and before *Aranda* was decided, a motion to sever had been made and the judge said it was denied by the court.[9] The defendants never indicated in any way thereafter that they no longer desired a severance. Therefore, if, when the *Aranda* question later arose, the judge had granted a mistrial on his own motion, defendants would be deemed to have consented to the mistrial, since it was granted to achieve their original objective of severance. Of course, if defendants consent to a mistrial they cannot successfully later urge former jeopardy. (E.g., *Cardenas* v. *Superior Court,* 56 Cal.2d 273, 276 [14 Cal.Rptr. 657, 363 P.2d 889, 100 A.L.R.2d 371].) Moreover, if defendants had refused to consent to severance, it would appear that they had waived their rights under *Aranda,* because they would then have prevented the court from utilizing the only equitable solution to the *Aranda* problem.[10]

---

[9]Prior to trial counsel for Juanelda, and perhaps Terry's counsel as well, moved for a severance (Pen. Code, § 1098). The clerk's transcript does not contain an entry of this motion. However, the trial judge twice referred to this motion, which he said he had denied. The People contend that the absence of an entry in the clerk's transcript concerning this motion indicates that the trial judge was in error when he twice stated that he recalled such a motion and that he had denied it. The plain reference to the motion twice in the reporter's transcript cannot be ignored. But as pointed out, *infra,* the failure to grant a severance did not constitute reversible error to either defendant.

[10]There is dictum in *Aranda* indicating that if the prosecutor has successfully resisted a motion for severance, confessions that implicate a codefendant must be entirely excluded where effective deletion is impossible. (*People* v. *Aranda, supra,* 63 Cal.2d 518, 531.) However, it would be unjust to apply this dictum against a prosecutor who resisted a motion for severance made *before* the *Aranda* decision. If he so acts in the face of *Aranda,* however, it would be fair to make him proceed with the trial without the confessions.

■ Although there was an *Aranda* error, under the facts it was not prejudicial to Terry. ■ The test for weighing the prejudicial effect of an *Aranda* error is set forth in *People v. Massie,* 66 Cal.2d 899, 922-923 et seq. [59 Cal.Rptr. 733, 428 P.2d 869], wherein it is stated, "We must weigh the prejudicial impact of all of the significant effects that may reasonably be assumed to have stemmed from the erroneous denial of a separate trial," but reversal is required only if there is "a reasonable probability that the defendant would have obtained a more favorable result at a separate trial."

■ When the part of a confession that incriminates a codefendant is repeated by the latter in his own confession—or on the stand—generally the *Aranda* error is harmless. (*People v. Lara, supra,* 67 Cal.2d 365, 392-393; *People v. Gant,* 252 Cal.App.2d 101, 111-112 (60 Cal.Rptr. 154].) ■ The general rule is here applicable. Terry alleges that the admission of the Juanelda confessions with ineffective deletions compelled him to take the stand and confess his guilt (cf. *People v. Spencer,* 66 Cal.2d 158, 163-165 [57 Cal.Rptr. 163, 424 P.2d 715]). But this argument fails unless Terry's own confession before trial was also inadmissible. While he contends that his confession was coerced, the record supports the finding that it was voluntary. Obviously, what induced Terry to take the stand and confess was his own extrajudicial confession, not Juanelda's ineffectively deleted statements.

If the court had correctly ordered a severance when the *Aranda* problem presented itself, the jury in Terry's case would not have heard Juanelda's extrajudicial confessions. Further, it probably would not have heard her testimony that Terry pushed her around, that she was afraid of him, and that they had intercourse on their first date. There was also testimony that Terry beat Juanelda on one occasion and that he threatened to kidnap her. If there had been separate trials Juanelda probably would not have testified against Terry. Since she loved him, she probably would have invoked her privilege against self-incrimination. Had she testified, Terry would have been entitled to instructions that her testimony, as that of an accomplice, should be considered with caution. Furthermore, had there been separate trials, Terry's attorney probably would not have brought out—as he did on cross-examination of Juanelda—several prior crimes Terry and Juanelda allegedly engaged in together.

Although the denial of the severance had the foregoing effects, it is clear in view of the overwhelming evidence of Terry's guilt that the denial of the severance and receipt of Juanelda's confessions at the guilt trial was not prejudicial error. (*People v. Massie, supra,* 66 Cal.2d 899; *People v. Watson,* 46 Cal.2d 818, 836 [299 P.2d 243].) ■ Nor was it preju-

dicial error to tell the jury that on the penalty trial they could consider all the evidence at the guilt trial.

Of course, if this error were substantial and could have affected the result, the error would require that the penalty verdict be reversed. (*People v. Price,* 63 Cal.2d 370, 373 [46 Cal.Rptr. 775, 406 P.2d 55]; *People v. Hines,* 61 Cal.2d 164, 168-170 [37 Cal.Rptr. 622, 390 P.2d 398]; *People v. Hamilton,* 60 Cal.2d 105, 136-138 [32 Cal.Rptr. 4, 383 P.2d 412], overruled on other grounds in *People v. Morse,* 60 Cal.2d 631, 649 [36 Cal.Rptr. 201, 388 P.2d 33, 12 A.L.R.3d 810].) But the evidence in question, reasonably, did not affect the death penalty verdict. There was evidence introduced at the penalty trial that Terry had committed numerous priors. In view of this evidence, and the evidence properly introduced, of the brutality of the two killings, Juanelda's extrajudicial confessions and even her court testimony, were insignificant and unimportant. In fact, at the penalty trial, Terry's attorneys did not deny that he was a vicious killer or a depraved man. They argued that this condition was due to a form of mental illness in that he had sudden uncontrollable outbursts of fury.

 A further question presented, although not argued by the parties, is whether under *Bruton v. United States,* 391 U.S. 123 [20 L.Ed.2d 476, 88 S.Ct. 1620], the receipt of Juanelda's extrajudicial confessions violated Terry's right of confrontation secured by the Sixth Amendment of the United States Constitution, made applicable to the states by the Fourteenth Amendment (*Pointer v. Texas,* 380 U.S. 400 [13 L.Ed.2d 923, 85 S.Ct. 1065]).[11] *Bruton* holds that it is a denial of the right of cross-examination guaranteed by the confrontation clause of the Sixth Amendment, to admit at a joint trial an extrajudicial confession of a defendant that implicates his codefendant despite the giving of limiting instructions. In *Bruton* the defendant who made the confession did not take the stand, whereas here Juanelda testified at the trial and was cross-examined at that time by Terry's counsel. However, the majority opinion in *In re Hill,* 71 Cal.2d 997 [80 Cal.Rptr. 537, 458 P.2d 449], concludes that, according to its interpretation of *Bruton* in the light of recent right-to-confrontation cases, the admission at a joint trial of an extrajudicial confession of a defendant which seriously implicates the codefendant deprives the latter of his right to confrontation even if the confessing defendant takes the stand and gives testimony in accordance with his prior confession.

---

[11]*Bruton v. United States, supra,* 391 U.S. 123, was decided after the instant trial, but it is applicable herein (*Roberts v. Russell,* 392 U.S. 293 [20 L.Ed. 2d 1100, 88 S. Ct. 1921]).

Accordingly, it is necessary to consider whether the People have proved "beyond a reasonable doubt that the error . . . did not contribute to the verdict obtained." (*Chapman* v. *California,* 386 U.S. 18, 24 [17 L.Ed.2d 705, 710, 87 S.Ct. 824, 24 A.L.R.3d 1065].) The *Hill* majority opinion states (71 Cal.2d at p. 1014, fn. 5) "when the confessing codefendant testifies as to matters contained in his confession and in a manner consistent therewith then the opportunity to cross-examine him will, in most instances, render the admission of his confession harmless." Here Juanelda testified as to matters contained in her confessions and in a manner consistent therewith, except for minor details and for added matters in her testimony such as that she aided Terry in the Burnett robbery only out of fear that he might harm her if she didn't, and Terry, of course, had an opportunity to cross-examine her at the trial. Furthermore the evidence against Terry was overwhelming, including, among other things, his own extrajudicial confession and testimony admitting his guilt of both crimes. Under the circumstances we believe that there is no " 'reasonable possibility that the evidence [in question] might have contributed to the conviction.' " (*Chapman* v. *California, supra,* 386 U.S. at p. 23 [17 L.Ed.2d at p. 710].)

Juanelda also complains of an *Aranda* violation. She does not object to Terry's extrajudicial confession, which implicated her, and which was read to the jury without deletions. In fact, Terry's extrajudicial confession was helpful to her case. It was consistent with her position that she was ignorant of the two robberies until they were in progress, and that she participated in the Burnett job only under duress. She objects to the deletions made in her own confessions. It is her view that the deletions distorted her confessions to her prejudice. She urges that since her defense was duress caused by fear of Terry, she was entitled to have the jury know that in her first confession she made reference to Terry having ordered her about during the two crimes. The later-admitted psychiatric testimony tended to show that she had a particular fear of Terry, not of "Mr. Deleted." Thus, so she claims, it was error to distort her confessions by removing all reference to Terry.

It is true that *Aranda* forbids the making of deletions unless they can be made "without prejudice to the declarant" (*People* v. *Aranda, supra,* 63 Cal.2d 518, 530), but there was no prejudice here. As already pointed out, it is impossible to believe that any reasonable person could have listened to Juanelda's confessions with the word "Terry" stricken and the term "deleted" inserted without knowing that the word "deleted" referred to Terry. Under such circumstances there could have been no prejudice to Juanelda by admitting her confessions with the deletions.

Juanelda also complains that the failure to grant her a separate trial, in accordance with the underlying theory of *Aranda* was prejudicial to her for other reasons. She points out that under the doctrine stated in *People* v. *Massie, supra,* 66 Cal.2d 899, in determining whether the error was prejudicial we must examine "significant differences from the joint trial that would have occurred if the defendant had been tried separately. . . . [Citations.]" In this connection Juanelda asserts that the joint trial gave Terry's attorneys full opportunity to cross-examine Juanelda and to bring out facts that would not have been admissible had separate trials been held, an opportunity of which they took full advantage. Apparently it was part of the strategy of Terry's counsel not to prove that their client was innocent but that Juanelda was equally guilty; that since she could not be given the death penalty because of her age he should not have that penalty imposed upon him. It is true that counsel for Terry obviously were attempting to get a first degree verdict against Juanelda, and that they brought out much evidence that was apparently unknown to the prosecution and which was very damaging to Juanelda and to her defense. But all this evidence would have been admissible had she been afforded a separate trial. Terry could have testified to every fact now challenged had he been called as a witness for the prosecution in such a separate trial. There is no reason to believe he would not have done so. Under such circumstances, the error was not prejudicial.

Although Juanelda does not complain of the receipt of Terry's extrajudicial confession, which implicated her and which was read to the jury without deletions, the receipt of that confession violated her federal constitutional right of confrontation under the interpretation we have given *Bruton* v. *United States, supra,* 391 U.S. 123, in the light of recent right-to-confrontation cases (*In re Hill, supra,* 71 Cal.2d 997). However, since as previously stated his confession was helpful to her case we believe there is no " 'reasonable possibility that the evidence [in question] might have contributed to the conviction.' " *Chapman* v. *California, supra,* 386 U.S. 18, 23 [17 L.Ed.2d 705, 710].)

*Coerced Confession Issues*

Terry contends his confessions were coerced by physical beatings, by preventing him from sleeping for many hours, and by long and grueling interrogation. The contention lacks merit.

The record discloses Terry was arrested about noon on March 4, that interrogation of him began about 2:30, that he gave his first confession at 4:30 a.m., and his second confession at 4:56 a.m., March 5. Police testified

that for several hours Terry refused to make any incriminating statements. He was warned of his *Dorado* rights at least twice before any process of interrogations began.

His attorney, at *voir dire* examination outside the presence of the jury, vigorously cross-examined the interrogating officer on the point of coercion. He asked the officer if he knew anything about Terry being beaten or struck or being threatened with violence if he did not confess. He inquired about photographs of Terry taken in jail which allegedly show he was beaten.[12] He asked whether a physician had been called to treat Terry's bruises received by being beaten. The officer denied Terry was beaten or threatened; he knew nothing about the physician or a photographer. Terry's attorney dropped the inquiry then and submitted the question of voluntariness to the court. The court found the confessions admissible.

In the presence of the jury the interrogating officer testified that no violence or threat was employed to get Terry to confess, but admitted that Terry was interrogated for several hours before he would confess.

Terry took the stand. While admitting his responsibility for the two killings, he stated that he had lied in his confessions to protect Juanelda, and he said his confessions were obtained at a time when he had not slept for 26 hours. Although he discussed the reliability of his confessions, he made no mention of any beating or threat of violence.

There was ample evidence upon which the judge and jury found Terry's confessions to be voluntary. Making our independent assessment of the uncontradicted evidence as we must do in such cases (e.g., *People* v. *Underwood,* 61 Cal.2d 113, 121 [37 Cal.Rptr. 313, 389 P.2d 937]), we cannot state that Terry's confessions were coerced.

*Search and Seizure Issues*

Terry contends his revolver, the murder weapon, was erroneously admitted into evidence because it was the product of an illegal search and seizure. As Terry recognizes, he may not raise the contention on appeal because his attorneys at no time objected at trial to the admissibility of the weapon. (E.g., *People* v. *Talbot,* 64 Cal.2d 691, 709 [51

[12]These photographs were not introduced at the trial and so, of course, are not in the record on appeal. They are attached as an exhibit to one of Terry's briefs. His counsel moved to augment the record to include these photographs. This court denied the motion, but out of an abundance of caution, and in fairness to Terry, we have examined the photographs. They do show some bruises on Terry's body, but there is nothing to show, and no testimony, that they were the result of a beating or were inflicted by the police. Terry had ample opportunity to offer evidence on these points but he did not do so. In the absence of any evidence on the point, and at this late date, we must assume that the bruises on his body did not result from police violence.

Cal.Rptr. 417, 414 P.2d 633] [cert. den. 385 U.S. 1015 (17 L.Ed.2d 551, 87 S.Ct. 729)] [overruled on another ground in *People* v. *Ireland*, 70 Cal.2d 522, 540 [75 Cal.Rptr. 188, 450 P.2d 580]; *People* v. *Richardson*, 51 Cal.2d 445, 447 [334 P.2d 573].) Terry urges, however, that failure to object rendered representation by counsel a farce and a sham, itself grounds for reversal. (*People* v. *Ibarra*, 60 Cal.2d 460, 464 [34 Cal.Rptr. 863, 386 P.2d 487].) In *Ibarra* the record disclosed on its face good grounds for an objection and demonstrated that counsel there was ignorant of the legal principle entitling him to object. (P. 465.) In the instant case Terry was represented by two skilled attorneys, and there is nothing in the record intimating that the search which produced the revolver was unreasonable and hence prohibited.

Officer Armando testified that on March 5 he went to a house occupied by Carole Terry, defendant Terry's estranged wife, and her father, the owner of the house. They invited Armando and a fellow officer to come in. Armando went up to Mrs. Terry's bedroom, and there she took from her closet the revolver and gave it to Armando.

Terry attaches to his supplemental brief an affidavit of Mrs. Terry stating that she consented to the search only under duress from her father. It was her father who invited police into her bedroom. While there, police observed some goods Terry had stolen. In Mrs. Terry's closet her father saw some leather cases. One of these was unzipped and a rifle and other weapons could be seen inside it. Mrs. Terry's father said the weapons had to be removed from his house. The police took them. The murder weapon was among them. This affidavit is not part of the record on appeal, this court having denied Terry's motion to augment, to include the affidavit in the record. But even if it were part of the record, the facts recited in the affidavit do not make the search and seizure unreasonable.

Mrs. Terry's father, according to uncontradicted evidence, owned the house. Either he or Mrs. Terry or both invited police to make a search. Police observed various firearms while making the search, and either Mrs. Terry or her father consented to their being seized. Since Terry neither lived at this house, nor was a guest there, Mrs. Terry was entitled to let police search it for his effects. (*People* v. *Cruz*, 61 Cal.2d 861, 866 [40 Cal.Rptr. 841, 395 P.2d 889]; *People* v. *Van Eyk*, 56 Cal.2d 471, 478 [15 Cal.Rptr. 150, 364 P.2d 326].) It is immaterial whether her consent was obtained due to duress by her father, since such duress was not applied by the police. There is no evidence that the murder weapon was in a sealed box or other container belonging to Terry, which Mrs. Terry might not have had authority to permit to be searched. (Cf *People* v. *Cruz*, *supra*, 61 Cal.2d 861, 867; *People* v. *Murillo*, 241 Cal.App.2d 173 [50 Cal.Rptr.

290].) In sum, the search and seizure were lawful. Terry's attorneys expressly admitted this fact at the penalty trial.

 Even if it were clear from the record that the search and seizure were unlawful, no violation of the *Ibarra* principle would appear here. The single lapse of exercise of skill resulting in failure to object did not result in denial of a fair trial (*People* v. *Ibarra, supra,* 60 Cal.2d 460, 465), did not deprive Terry of any defense (*id.,* pp. 465-466), and did not render representation by counsel a farce or a sham. Proof of Terry's guilt was overwhelming and could not possibly have been affected by ruling that the murder weapon was inadmissible. (Cf. *Chapman* v. *California, supra,* 386 U.S. 18.) As Terry's attorneys told the jury at the penalty trial, they never intended to urge that Terry was innocent of first degree murder.

 Both Terry and Juanelda contend that incriminating evidence seized at their apartment during a search incident to her arrest was inadmissible because the police did not have probable cause to arrest her. A timely objection on this basis was made, but the trial judge properly ruled that the police had probable cause to arrest Juanelda.

 The applicable law is summarized in the case of *People* v. *Ross,* 67 Cal.2d 64, 69-70 [60 Cal.Rptr. 254, 429 P.2d 606] (revd. on other grounds 391 U.S. 470 [20 L.Ed.2d 750, 88 S.Ct. 1850]):

"It is axiomatic that a search . . . incidental to a lawful arrest is valid. [Citations.]

"A peace officer may arrest a person without a warrant whenever he has reasonable cause to believe that the person to be arrested has committed a felony. (Pen. Code, § 836, subd. (3).) 'Reasonable cause' is defined as that state of facts as would lead a man of ordinary care and prudence to believe and conscientiously entertain an honest and strong suspicion that the person is guilty of a crime. (*People* v. *Ingle,* 53 Cal.2d 407, 412 [2] [2 Cal.Rptr. 14, 348 P.2d 577]; . . .) No exact formula exists for determining reasonable cause, and each case must be decided on the facts and circumstances presented to the officers at the time they were required to act. [Citations.]"

 The police in the instant case had ample reason for entertaining a "strong suspicion" that Juanelda participated in the Burnett and Leong killings. She concedes that the police had reasonable cause to arrest Terry. This is an important consideration in weighing the reasons the police had to arrest her.[13] Eyewitnesses to the Leong slaying observed that a woman was the driver of the getaway car. A man and a woman had reportedly

---

[13]Reasonable cause to arrest Terry was based on the following: Leong was killed by a Negro male who escaped in a car which matched the description of one Terry

followed Leong home from the Safeway store several days before the homicide. What appeared to be a woman's spike heel print indicated that a woman was also implicated in the Burnett murder. Who was this woman? Berkeley police learned from a tested informant (see fn. 10, *ante*), Roy Williams, that Juanelda and Terry were living together. This information was corroborated by Juanelda's husband. Oakland police were entitled to rely on the information supplied to them by the Berkeley police. (*People* v. *Ross, supra,* 67 Cal.2d 64, 70 [revd. on other grounds, 391 U.S. 470 (20 L.Ed.2d 750, 88 S.Ct. 1850)]; *People* v. *Schellin,* 227 Cal.App.2d 245, 251 [38 Cal.Rptr. 593].) The Contra Costa County sheriff's office informed the arresting officer that Terry had been identified as a participant in the recent robbery at Alamo. He had been accompanied there by a pregnant Negro girl. Hospital records disclosed Juanelda gave birth to a baby about a month later in Oakland. She had also recently visited in Alameda County jail Charles Jones, owner of the car used at the Safeway episode, and himself criminally associated with Terry.

This information "inclines the mind to believe" that Juanelda was the woman accompanying Terry at the Safeway and Burnett Pharmacy crimes. (*People* v. *Ingle, supra,* 53 Cal.2d 407, 413.) True, the information leaves room for doubt, but this is permissible. (*Id.*) The arrest was proper because the police were reasonably able to entertain a strong suspicion of her complicity. (*People* v. *Ross, supra,* 67 Cal.2d 64, 70 [revd. on other grounds 391 U.S. 470].) Her arrest being lawful, the search of the apartment incident to that arrest was also lawful. (E.g., *People* v. *Gilbert,* 63 Cal.2d 690, 706 [47 Cal.Rptr. 909, 408 P.2d 365], vacated 388 U.S. 263 [18 L.Ed.2d 1178, 87 S.Ct. 1951].)[14]

Defendants also argue that even if the search were lawful, the police wrongfully seized "mere evidence," e.g., clothes of the defendants. There is no need to discuss here defendants' attempt to distinguish *People* v. *Thayer,* 63 Cal.2d 635 [47 Cal.Rptr. 780, 408 P.2d 108]—holding the

---

was using. The same gun killed Leong and Burnett. Terry had previously been convicted in Oregon of armed robbery and was suspected of perpetrating another recent robbery in Alamo. Terry had been identified from a photograph as having been in Burnett's pharmacy some time before the robbery-murder there. The crucial information that Terry was using the getaway car—identified at the Safeway episode— during the month when the two crimes were committed was provided by a reliable informant, Roy Williams, and corroborated by information given by Juanelda's husband. Police therefore could rely on the information given by Williams. (E.g., *Willson* v. *Superior Court,* 46 Cal.2d 291, 294-295 [294 P.2d 36]; *People* v. *Melchor,* 237 Cal.App.2d 685, 688-689 [47 Cal.Rptr. 235].)

[14]Since the search preceded *Chimel* v. *California,* 395 U.S. 752 [23 L.Ed. 2d 685, 89 S.Ct. 2034], that decision is inapplicable herein. (*People* v. *Edwards,* 71 Cal.2d 1096 [80 Cal.Rptr. 633, 458 P.2d 713].)

"mere evidence" rule inapplicable in California—since the United States Supreme Court itself recently repudiated the "mere evidence" rule and the prior federal cases defendants rely on. (*Warden, Maryland Penitentiary* v. *Hayden,* 387 U.S. 294 [18 L.Ed.2d 782, 87 S.Ct. 1642].)

## Proof of Terry's Escape

Terry contends that the prejudicial effect of proof of his escape from jail outweighs any probative value it might have in respect to his guilt and was, accordingly, erroneously admitted into evidence. Terry concedes that escape from jail pending trial is ordinarily admissible as an indication of consciousness of guilt (e.g., *People* v. *Burnett,* 251 Cal.App.2d 651, 654-655 [59 Cal.Rptr. 652]; *People* v. *Kostal,* 159 Cal.App.2d 444, 451 [323 P.2d 1020], disapproved on other grounds in *Funk* v. *Superior Court,* 52 Cal.2d 423, 425 [340 P.2d 593]; see *People* v. *Ellis,* 65 Cal.2d 529, 537, 538, fn. 12 [55 Cal.Rptr. 385, 421 P.2d 393], but argues that the rule should not be applied where escape occurs several months after incarceration commenced. This argument has previously been rejected by California courts (*People* v. *Ellis,* 188 Cal. 682, 693-694 [206 P. 753]; *People* v. *Kostal, supra,* 159 Cal.App.2d 444, 451). These precedents are sound. Terry contends it is likely that one who has been incarcerated several months escapes because he cannot bear further incarceration. This is possible, but it is also probable that only one who expects his guilt to be proved at trial will attempt an escape and that an innocent man will stay for trial in order to clear his name and win lawful liberty.[15] ▉ In any event, the question of time of escape goes to the weight to be given evidence of escape pending trial, not to its admissibility. In accordance with section 1127c of the Penal Code (see *People* v. *Hill,* 67 Cal.2d 105, 119-120 [60 Cal.Rptr. 234, 429 P.2d 586] [cert. den. 389 U.S. 1009 (19 L.Ed.2d 607, 88 S.Ct. 572)]), the jury was instructed that the decision whether the escape showed consciousness of guilt was for it to make on the basis of all the circumstances presented to it. It was not instructed that every escape is probative of consciousness of guilt.[16]

---

[15]The escape here was also probably admissible as part of the res gestae or circumstances surrounding an admission made by Terry. During the escape Terry threatened an officer with these words: "I have killed two men already. It doesn't make any difference to me if I kill you too." To say the least, this statement made during the escape tends to demonstrate consciousness of guilt.

[16]The instruction given reads: "The flight of a person immediately after the commission of a crime, or after he is accused of a crime that has been committed, is not sufficient in itself to establish his guilt, but is a fact which, if proved, the jury may consider in deciding his guilt or innocence. The weight to which such circumstance is entitled is a matter for the jury to determine. Whether or not evidence of flight shows a consciousness of guilt, and the significance to be attached to such a circumstance, are matters for your determination."

*Proof of Other Crimes by Juanelda*

Juanelda contends the court erroneously permitted her to be examined about her alleged participation in other robberies and crimes with Terry, in particular the Alamo robbery.

 Evidence of Juanelda's involvement in the Alamo robbery was plainly relevant. Her defense was that at both the Burnett and Leong homicides she was unaware that Terry had criminal intent until he drew his gun; thereafter, she claimed she participated only under duress, out of fear for her safety. If Juanelda knew about the Alamo robbery, this tended to establish that she ought reasonably to have understood from Terry's conduct at Burnett's Pharmacy and at the Safeway store, even before he drew his gun, that he planned robberies at those places. Although proof of involvement in prior crimes is not admissible merely to show propensity for crime (*People* v. *Cramer,* 67 Cal.2d 126, 129 [60 Cal.Rptr. 230, 429 P.2d 582]; *People* v. *Kelley,* 66 Cal.2d 232, 238 [57 Cal.Rptr. 363, 424 P.2d 947], such evidence is admissible to prove motive, knowledge, or intent when such is an issue in the case (e.g., *People* v. *Sykes,* 44 Cal.2d 166, 170 [280 P.2d 769]; *People* v. *Buice,* 230 Cal.App.2d 324, 341 [40 Cal.Rptr. 877]; *People* v. *Torres,* 98 Cal.App.2d 189, 192 [219 P.2d 480]; see *People* v. *Gonzales,* 87 Cal.App.2d 867, 877-878 [198 P.2d 81]). In other words, proof of involvement in prior crimes is admissible if it tends " 'to overcome any material matter sought to be proved by the defense' " (*People* v. *Sykes, supra,* 44 Cal.2d 166, 170), and, in particular, to rebut a defense that a criminal act was done out of "honest fear" (*People* v. *Wells,* 33 Cal.2d 330, 342 [202 P.2d 53]). (See generally, Witkin, Cal. Evidence (2d ed. 1966) § 345, pp. 303-306.)

Juanelda also argues that even if the proof of the Alamo robbery was relevant, it was inadmissible because there was no clear and convincing proof connecting her with the crime. (*People* v. *Wade,* 53 Cal.2d 322, 330 [1 Cal.Rptr. 683, 348 P.2d 116]; *People* v. *Rosenfield,* 243 Cal.App.2d 60, 68 [52 Cal.Rptr. 101].) There was such evidence. She admitted she was present at the commission of this crime and that she realized that a robbery had been committed when Terry and his accomplice began loading loot into the car. She alleges there was no clear and convincing proof that she was a principal—that she actively participated in the robbery with knowledge thereof. But such proof was not necessary. Evidence of the Alamo robbery was relevant whether or not Juanelda was guilty of robbery at that time, since she concededly learned by this incident that Terry was a robber. This knowledge she gained of his character tended to rebut her claim of ignorance of his design to rob the Safeway and the pharmacy.

*Effect of Erroneous Newspaper Report*

Juanelda contends the court erroneously denied her motion for new trial which was based on the ground of an erroneous Oakland Tribune report of her testimony. The article appeared on December 9, 1965, near the end of the guilt trial, and stated that Juanelda had admitted on the stand that she "had knowledge that Terry planned the robbery after casing the stores." Juanelda had not so testified. This incorrect information was one isolated sentence—the last sentence—in an otherwise correct article.

Juanelda does not allege that any juror read this article, and we must presume they did not. At the outset of the trial, during selection of jurors, at the time of every adjournment of the court, and on the very day the article in question was printed the judge carefully and fully admonished the jurors not to discuss the case (Pen. Code, § 1122) and not to read any newspaper articles about the case or about the trial.

Even if a juror had read the article, he would not likely have been influenced by it, since the jury had itself heard Juanelda testify and would have realized that the newspaper report was inaccurate. In any event, because of the continual admonitions given the jury about newspapers, before she would be entitled to a new trial because of the single sentence misreporting her testimony, she would be required to come forward with some evidence—such as affidavits—that one or more jurors read the sentence and was influenced by it. (Cf. *People v. Kroeger,* 61 Cal.2d 236, 245 [37 Cal.Rptr. 593, 390 P.2d 369].)

*Insufficiency of Evidence*

 Juanelda contends there was insufficient evidence to support the jury's verdict against her. This contention lacks merit. She admitted participation in both the Safeway and Burnett episodes. There was evidence that she was with Terry when he "cased" the market and pharmacy prior to the commission of the crimes. She knew from Alamo that Terry was a robber, and she bought bullets for his gun prior to the Safeway robbery attempt. From this and considerable other evidence a strong inference arose that she knew, before the fact, on both occasions of Terry's criminal intent. This reasonable inference, coupled with Juanelda's admissions and circumstantial evidence, was more than sufficient to support the verdict. (E.g., *People v. Newland,* 15 Cal.2d 678, 681 [104 P.2d 778].)

*Alleged Judicial Misconduct*

 James Williams, who raised Juanelda from infancy, was called by her to testify about various events occurring to her in prior years. He was asked to describe her reactions when Mrs. Williams, whom Juanelda

treated as her mother, died in 1961. The prosecutor objected on the ground, among others, of immateriality. In overruling the objection the court stated: "This could be the basis of the expert's testimony. In other words, they are going to have to present certain facts to the expert. I have listened to enough *psychiatrists,* and they *can get all excited about somebody spitting on the floor when you are two months old, or something like that,* and then they say this thing is important, and it may be that if she had some reaction when the woman died that this might be a very important factor as far as the expert is concerned." (Italics added.) The very next witness called was a psychiatrist, and Juanelda relied strongly on his diagnosis of her as a passive individual who might blindly follow Terry—even into crime—because of her love and fear of him.

The judge's remark is somewhat ambiguous, but it could have been viewed by the jury as indicating that the judge would give little weight to psychiatric diagnosis. If so interpreted, such a remark would be misconduct. (Cf. *People* v. *Brock,* 66 Cal.2d 645 [58 Cal.Rptr. 321, 426 P.2d 889].) ▮ But Juanelda did not object to it and did not ask for an admonition to the jury to disregard it. In such circumstances the error can normally not be raised on appeal. (E.g., *People* v. *Corrigan,* 48 Cal.2d 551, 556 [310 P.2d 953]; *People* v. *Amaya,* 40 Cal.2d 70, 78 [251 P.2d 324]; *People* v. *Avery,* 35 Cal.2d 487, 493 [218 P.2d 527].) However, it is settled that when an objection and an admonition could not cure the prejudice caused by improper remarks, failure to object does not preclude urging the error on appeal. (E.g., *People* v. *Mahoney,* 201 Cal. 618, 622 [258 P. 607]; *People* v. *Arends,* 155 Cal.App.2d 496, 507-508 [318 P.2d 532]; *People* v. *Zammora,* 66 Cal.App.2d 166, 205 et seq. [152 P.2d 180]; *People* v. *Weeks,* 104 Cal.App. 708, 713-714 [286 P. 514].) ▮ This was not such a case. An admonition, had one been requested, would obviously have clarified the ambiguity.

*Failure to Instruct on Accomplice Testimony*

▮ Terry complains because the court did not, on its own motion, instruct the jury that it could not convict on the uncorroborated testimony of an accomplice (Pen. Code, § 1111) and that testimony of an accomplice —namely Juanelda—should be viewed with distrust (former Code Civ. Proc., § 2061, subd. 4). While the judge is required to give such instructions on his own motion in a proper case *(People* v. *Warren,* 16 Cal.2d 103, 118-119 [104 P.2d 1024]; see *People* v. *Catlin,* 169 Cal.App.2d 247, 254 [337 P.2d 113], this was not a proper case. The very question submitted to the jury was whether Juanelda was an accomplice. To instruct the jury about accomplices in respect to her testimony might have been prejudicial to her. *(People* v. *Arends, supra,* 155 Cal.App.2d 496, 512-513).

Ordinarily, the instructions on accomplice testimony need be given on the court's own motion only when the accomplice witness is called by the People (*People* v. *Gurule,* 236 Cal.App.2d 847, 854-855 [46 Cal.Rptr. 459]; *People* v. *Melone,* 71 Cal.App.2d 291, 297 [162 P.2d 505]) or when a defendant in testifying implicates his codefendant while confessing his own guilt (*People* v. *Catlin, supra,* 169 Cal.App.2d 247, 255). In the latter instance, the confession on the stand, for all practical purposes, relieves the jury of the decision whether the declarant was an accomplice. When a defendant has confessed his guilt, there is little need to worry about prejudicing him by giving an accomplice testimony instruction for the protection of his codefendant. But here Juanelda testified in her own behalf, not as a prosecution witness, and denied her guilt. Thus, it was not incumbent to give the accomplice testimony instructions. (*People* v. *Green,* 181 Cal.App.2d 747 [5 Cal.Rptr. 525].)

Terry points out that in *People* v. *Marrone,* 210 Cal.App.2d 299, 312 [26 Cal.Rptr. 721], in circumstances not distinguishable from the instant case, the court held it was not error to give instructions on accomplice testimony. There, as here, one defendant admitted doing the criminal acts along with his codefendants but denied he had criminal intent. If we assume without deciding that *Marrone* was properly decided, that case is distinguishable. *Marrone* holds it was not error to *give* the instructions; it does not hold they *must* be given. Therefore, it would appear that where a defendant testifies in his own behalf and denies guilt while incriminating a codefendant, it is at most for the discretion of the trial judge whether to give accomplice testimony instructions on his own motion.

Furthermore, even if *Marrone* required giving the instructions in the instant case, the failure to do so could not possibly constitute prejudicial error against Terry. He confessed his guilt on the stand, and, as we have seen, this judicial confession was compelled by his prior out-of-court confession and not by any procedural errors occurring at his trial.

Juanelda also contends that the court erred in failing to instruct the jury about accomplice testimony in regard to Terry's testimony which incriminated her. As we have seen, Terry confessed on the stand, and therefore the instructions had to be given on the court's own motion. (*People* v. *Catlin, supra,* 169 Cal.App.2d 247, 255.) In view of the other evidence including her own confessions and testimony the failure to so instruct was not prejudicial.

*Scope of Cross-Examination of Juanelda*

The court permitted the prosecutor to elicit on cross-examination of Juanelda—and over objection—the fact that she had sexual relations

**400**

with Terry on their first date. Juanelda contends that this line of inquiry was not relevant and was prejudicial. It would appear, however, that the fact was relevant. Juanelda had testified that she loved Terry; her defense was that her state of mind, caused by a love-fear syndrome in respect to Terry, caused her to yield to his coercion at the pharmacy robbery-homicide and not to question him to learn whether he was planning robberies at the pharmacy and the supermarket prior to the fact in each instance. That she had intercourse with Terry on their first date was evidence that her relationship with him was physical rather than a childlike love. Moreover, on direct examination Juanelda opened up for inquiry the entire scope of her relationship with Terry. The cross-examination by the prosecutor was therefore proper.

■ Juanelda also complains about part of the cross-examination of her by Terry's attorneys. They elicited from her the fact that she was denied custody of her oldest child when she and Mosco Allen were divorced. They also questioned her about drawing welfare payments on the claim of living with James Williams at a time when she was actually living with Terry.[17] Such cross-examination was plainly impermissible. That she had been found unfit to have custody of her child and that she was guilty of welfare fraud were not relevant to the question of her relationship to Terry. The cross-examination on these matters was an attempt to prove bad character, which cannot be done until and unless the accused first puts in evidence his good character. (Evid. Code, §§ 1101, 1102; Witkin, Cal. Evidence (2d ed. 1966) § 329, pp. 291-292.) However, it was not prejudicial. In each instance as soon as Juanelda's attorney objected to the line of cross-examination it proceeded no further. Her attorney did not move to strike her answers on these two points and did not request an admonition to the jury. Although the court never squarely cut off cross-examination on these two topics, the record reveals no error of any substance resulted.

*Failure to Give Requested Instructions*

■ Juanelda argues that the court's failure to instruct the jury on diminished capacity was error. She submitted four instructions on diminished capacity, all of which were rejected by the trial court. This was not error. There was no evidence that she possessed a mental condition which made her "incapable of harboring the particular mental state constituting an element of the offense" (*People* v. *Anderson,* 63 Cal.2d 351, 366 [46 Cal.Rptr. 763, 406 P.2d 43])—that is, in the crime of robbery, "a specific intent to steal" (*People* v. *Butler,* 65 Cal.2d 569, 573 [55 Cal.Rptr. 511,

[17]It is clear from the record that Terry wished to establish that Juanelda was guilty of welfare fraud by receiving aid for families with dependent children while concealing an "adult male person assuming the role of spouse to the mother . . . ." (Welf. & Inst. Code, § 11351, formerly § 1508.)

421 P.2d 703]). Because there was no evidence at all of diminshed capacity on the part of Juanelda, the court was not required to instruct on that subject. (*People* v. *Bandhauer,* 66 Cal.2d 524, 528 [58 Cal.Rptr. 332, 426 P.2d 900] [cert. den. 389 U.S. 878 (19 L.Ed.2d 167, 88 S.Ct. 178)]; cf. *People* v. *Carmen,* 36 Cal.2d 768, 773 [228 P.2d 281].)

No part of the testimony of the psychiatrist called by Juanelda supports a diminished capacity instruction even under *People* v. *Carmen, supra,* 36 Cal.2d 768, 772-773, which entitles a defendant to instructions on his theory of the case if there is any evidence, however incredible it may seem, to support it. Dr. Rapaport's testimony concerned her personality and her possible motivation in following Terry into crime. On cross-examination he admitted that she had the capacity to form the intent to rob; he said her fear of Terry was responsible for her motive in aiding Terry and that this did not affect her capacity for intent.

The court also rejected the following instruction: "If you find that defendant ALLEN had not formed an intention to take the money or other property of Marshall Burnett and/or Dick Leong at all or until after they were killed, even though they were, in fact, killed, then you are instructed that the killing of said Marshall Burnett and Dick Leong as regards defendant ALLEN were not murders in the first degree committed in the perpetration of a robbery and therefore defendant ALLEN cannot be guilty of first degree murder on either count."

The instruction was properly refused because it is erroneous. If Juanelda aided and abetted Terry in the two crimes, she was a principal (Pen Code, § 31; *People* v. *Etie,* 119 Cal.App.2d 23, 28 [258 P.2d 1069]) and as such equally guilty with Terry of felony murder (e.g., *People* v. *Cain,* 216 Cal.App.2d 748, 752 [31 Cal.Rptr. 190]; *People* v. *Cabaltero,* 31 Cal.App.2d 52, 57 [87 P.2d 364]). It is clear that Juanelda could be an aider and abettor without ever forming the intent to take any money or other property from Burnett or Leong. She was an aider or abettor if, with knowledge of Terry's criminal purpose, she encouraged, promoted, or assisted in the commission of the crimes. (*People* v. *Holford,* 63 Cal.2d 74, 81 [45 Cal.Rptr. 167, 403 P.2d 423]; *People* v. *Belenger,* 222 Cal.App.2d 159, 163 [34 Cal.Rptr. 918]; *People* v. *Villa,* 156 Cal.App.2d 128, 133-134 [318 P.2d 828].) One who aids and abets does not necessarily have the intention of enjoying the fruits of the crime. (E.g., *People* v. *Lewis,* 113 Cal.App.2d 468 [248 P.2d 461] [encouraging statutory rape].)

The court also rejected the following instruction requested by Juanelda: "The specific intent of defendant ALLEN to commit a robbery cannot be inferred merely because of the fact a robbery occurred at a

place where she was present." This is, of course, a correct statement of law (cf. *People* v. *Hill, supra,* 67 Cal.2d 105, 118; *People* v. *Sears,* 62 Cal.2d 737, 745 [44 Cal.Rptr. 330, 401 P.2d 938]), her presence being but one factor which, together with others, would support a finding that she had the specific intent to rob or to assist in robbery. The general instruction on specific intent that was given was not adequate. When a defendant bases his contention of innocence on particular facts, he is entitled to have the jury instructed on the general law as it relates to those facts, if he submits proper instructions thereon. (*People* v. *Granados,* 49 Cal.2d 490, 496 [319 P.2d 346]; *People* v. *Kane,* 27 Cal.2d 693, 698-702 [166 P.2d 285].) The failure to give Juanelda's particular instruction on specific intent was error, but it was of little significance, and not prejudicial.

 The court also refused to give Juanelda's proposed instruction on the scope of a conspirator's liability.[18] But there was no evidence presented at the guilt trial from which the jury could conceivably hypothesize that either killing was other than in the furtherance of the common design to rob. Burnett was killed either to enable Terry and Juanelda to make their escape without the police being immediately informed of the robbery, or to prevent identification. The only possible reason for the killing of Leong must have been to prevent identification. Since the proposed instruction—although correctly stating the law—had no application to the facts of the case it was properly rejected. (E.g., *People* v. *Eggers,* 30 Cal.2d 676, 687 [185 P.2d 1].)

*Admissibility of Allegedly Inflammatory Photos*

Both defendants contend the court improperly admitted in evidence six color slides depicting wounds on the body of Burnett. The People called Dr. McNie, a pathologist who had performed an autopsy on Burnett, to explain how Burnett died. McNie illustrated his testimony with two charts, containing respectively drawings of the front and back of a human form, on which McNie had marked the locations of Burnett's wounds. He testified extensively about each wound. The People also had several color slides of Burnett's nude body depicting the wounds. Outside the presence of the jury these slides were presented to the court to rule on their admissibility. Discussion on this matter was held off the record. When the trial resumed before the jury six of the slides were displayed without objection.

---

[18]The proposed instruction reads: "You are instructed that where a conspirator [or one who is acting jointly in the commission of a crime with another] commits an act which is neither in furtherance of the object of the conspiracy or the intended crime nor the natural and probable consequence of an attempt to attain that object, he alone is responsible for and is bound by that act, and no responsibility therefor attaches to any of his confederates."

The People contend that defendants objected to only one of these slides, but the record indicates that during the discussion off the record the judge was asked to rule on the admissibility of all the slides. Therefore, there was no need for the defendants to make formal objection when the slides were admitted in evidence, after the judge had already considered the question of admissibility and ruled against defendants.

The photographs are hideous and grotesque, displaying the nude, dead, bloodstained body of Burnett dotted with numerous crimson-hued punctures. Dr. McNie had already illustrated his testimony with drawings of the human form on which the stab wounds were marked. The photographs were of little use to the jury in determining how Burnett had died. But they were of some relevance in understanding the medical testimony and so were admissible. (E.g., *People* v. *Nye*, 63 Cal.2d 166, 170 [45 Cal.Rptr. 328, 403 P.2d 736] [cert. den. 384 U.S. 1026 (16 L.Ed.2d 1033, 86 S.Ct. 1960)]; *People* v. *Darling*, 58 Cal.2d 15, 20, 21 [22 Cal.Rptr. 484, 372 P.2d 316].) The question of whether "the probative value of photographs offered into evidence outweighs the possible prejudicial effect is a question for the trial court in the exercise of its judicial discretion" (*People* v. *Harrison*, 59 Cal.2d 622, 627 [30 Cal.Rptr. 841, 381 P.2d 665]; *People* v. *Mathis*, 63 Cal.2d 416, 423 [46 Cal.Rptr. 785, 406 P.2d 65] [cert. den. 385 U.S. 857 (17 L.Ed.2d 84, 87 S.Ct. 105)]; *People* v. *Henderson*, 60 Cal.2d 482, 495 [35 Cal.Rptr. 77, 386 P.2d 677]). At any rate, even if it were error to introduce the pictures, such error, in view of the evidence already reviewed, could not have been prejudicial.

The judgments against both defendants are affirmed.

**PETERS, J.**—I concur in the majority opinion insofar as it affirms the judgments of guilt as to Terry, but I dissent in all other respects.

In my view, the trial court erred in excusing for cause a prospective juror, and this error alone requires reversal of the penalty judgments as to Terry. The trial court committed *Aranda* error, as conceded by the majority, and I believe this error also requires reversal of Terry's penalty judgments. In addition, I am of the opinion that Juanelda's confession was inadmissible and that the error in admitting it requires reversal of her guilt judgments. I believe that the trial court's failure to grant a separate trial also requires reversal of her guilt judgments.

In my opinion, the judgments imposing the death penalty as to Terry must be reversed under the compulsion of *Witherspoon* v. *Illinois*, 391 U.S. 510 [20 L.Ed.2d 776, 88 S.Ct. 1770]. I disagree with the majority's opinion that juror Bolla was properly excluded for cause under the constitutional standards enunciated in *Witherspoon*.

Mrs. Bolla's first statement concerning her attitude toward the death penalty was "I feel like I wouldn't be able to make a decision on the capital punishment, . . ." This statement clearly is not a sufficient basis for excluding Mrs. Bolla for cause under *Witherspoon.* First, Mrs. Bolla, "in qualifying her statement by the phrase 'I feel' suggested that she might not be certain of her precise position." (*People* v. *Vaughn,* 71 Cal.2d 406, 413 [78 Cal.Rptr. 186, 455 P.2d 122].) Moreover, the statement that "I wouldn't be able to make a decision on the capital punishment" contains the same ambiguities as the statement that "I cannot serve on a capital punishment case." The former statement, like the latter one, "is in the nature of a summary conclusion as to her ability to serve on the jury. It is susceptible of the interpretation that she had 'general objections to the death penalty or . . . conscientious or religious scruples against its infliction.' (*Witherspoon* v. *Illinois, supra,* 391 U.S. at p. 522 [20 L.Ed.2d at p. 785].) Her answer might also mean that because of her conscientious feelings about the death penalty she would find it distressing to impose such a punishment." (*People* v. *Goodridge,* 70 Cal.2d 824, 840 [76 Cal. Rptr. 421, 452 P.2d 637].)

Mrs. Bolla's next statement was in response to the trial court's inquiry whether if Terry were convicted of first degree murder she could under any circumstances vote for the death penalty; her reply was "Well, I believe that my religious beliefs would say no." This statement too falls woefully short of the unambiguous response demanded by *Witherspoon.* First, her statement was hedged by the phrase "I believe." (See *People* v. *Vaughn, supra,* 71 Cal.2d 406, 416.) More importantly, the statement "my religious beliefs would say no" is susceptible of the interpretation that she merely has "religious scruples" against the infliction of the death penalty but that she might be able to set aside those scruples or beliefs. (See *Witherspoon* v. *Illinois, supra,* 391 U.S. 510, 515-516, fn. 9, 522 [20 L.Ed.2d 776, 781-782, 784].)

Similarly, the court's next inquiry that "You feel religiously your beliefs are against that?", to which Mrs. Bolla replied "Yes," was hedged by the phrase "I feel" (*People* v. *Vaughan, supra,* 71 Cal.2d 406, 413) and asked her about her religious scruples only.

In response to the defense counsel's inquiry whether she could impose the death penalty in a case which she felt in her own mind was a proper one for the death penalty, Mrs. Bolla replied, "I think it would be rather hard for me to." The implication of this statement is that, although such a decision would be "rather hard" for her, Mrs. Bolla *could* in some cases return

a death verdict. This statement, which merely reflects "a strong distaste at the prospect of imposing a death sentence," clearly does not meet the standard enunciated in *Witherspoon.* (*People* v. *Fain,* 70 Cal.2d 588, 602 [75 Cal.Rptr. 633, 451 P.2d 65].)

The majority themselves concede that "[t]his response, if considered by itself, left open the possibility that she could under some circumstances return a death penalty, . . ." (*Ante,* p. 380.) However, they go on to assert: "but that possibility was eliminated when defense counsel continued his questioning and asked in effect whether she could return the death penalty if she felt that it was the proper thing to do even if she did so with great reluctance, and she replied, 'I don't think I could.' " (*Id.*) It is difficult to understand how the reply "I don't think I could [impose the death penalty]" can eliminate the possibility that the juror could under some circumstances return a death penalty, when this court has repeatedly held that this very statement does not constitute an unambiguous expression of inability to return a death penalty under any circumstances. (*People* v. *Osuna,* 70 Cal.2d 759, 768 [76 Cal.Rptr. 462, 452 P.2d 678]; *People* v. *Chacon,* 69 Cal.2d 765, 772-773; [73 Cal.Rptr. 10, 447 P.2d 106]; see *In re Hillery,* 71 Cal.2d 857, 863 [79 Cal.Rptr. 733, 457 P.2d 565].)

The majority purport to distinguish *Chacon* and *Osuna* by stating that "[t]his is not a case where the venireman answered 'I don't think so' in reply to the question 'if he could impose the death penalty.' In such a context the answer has been regarded as ambiguous. (*People* v. *Chacon,* 69 Cal.2d 765, 772-773; see also *People* v. *Osuna,* 70 Cal.2d 759, 768-769.)" (*Ante,* p. 380.) The implication of this statement is that *Chacon* and *Osuna* were narrowly limited to the situation where the juror states "I don't think so" in reply to the precise question "if he could impose the death penalty"—that only because it was made in "such a context" was the answer regarded as ambiguous.

Contrary to the implication of the majority's statement, both *Chacon* and *Osuna* quoted—in whole or in part—only the answers given by the prospective jurors; neither case set forth the precise question to which the jurors responded. And when one reads the language of *Chacon* and *Osuna* it becomes clear that these cases were concerned with the ambiguity of the *answers,* the statements by the *jurors,* caused by the ambiguity inherent in the word "think." In *Chacon* we held improperly excused a prospective juror "who answered, 'I don't think so' when asked if he could impose the death penalty. He was not allowed to give an *unambiguous* yes or no *answer* to the question." (69 Cal.2d 765, 772-773; italics added.) In *Osuna,*

relying upon *Chacon*, we held improperly excused four prospective jurors "who stated that they did not 'think' that they could impose the death penalty, but none [of whom] gave an *unambiguous answer* to the question whether he could or could not do so." (70 Cal.2d 759, 768; italics added.)[1]

In the instant case, Mrs. Bolla stated "I don't think I could" when asked whether she could return the death penalty if she felt that it were the proper thing to do even if she would do so with great reluctance. Like the prospective jurors in *Chacon* and *Osuna*, Mrs. Bolla did not give an "unambiguous answer" when asked whether she could impose the death penalty. A prospective juror's reply that he does not "think" he could when asked whether he could ever impose the death penalty is an equivocal answer; it indicates that the juror has some doubts as to his position and is not cerain in his own mind that he could not impose the death penalty. Such an equivocal response simply is not the "unmistakably clear" statement of automatic opposition demanded by *Witherspoon*. (See *Witherspoon* v. *Illinois, supra,* 391 U.S. 510, 522, fn. 21.)

Until the recent decision in *People* v. *Floyd,* 1 Cal.3d 694, 726 [83 Cal.Rptr. 608, 464 P.2d 64], written by Mr. Justice Burke, this court had never held that a statement of opposition to the death penalty that is hedged by equivocal words such as "think" or "believe" satisfies the *Witherspoon* requirement of an unambiguous expression of automatic opposition to the death penalty. (See my dissenting opinion in *People* v. *Floyd, supra,* 1 Cal.3d 694, 732-733, fn. 1.) The majority in *Floyd* ignored the prior cases holding that answers hedged by the term "think" were ambiguous in stating both unnecessarily and, in my opinion, incorrectly (see *id.*) that a juror is properly excluded who answers "I believe so" in response to the question whether he would be unable to return a death penalty verdict regardless of the evidence. (1 Cal.3d at p. 726.)

By broadly applying the above proposition set forth in *Floyd* and by narrowly restricting the holdings of *Chacon* and *Osuna*, the majority is obviously overruling the latter cases: Apparently the rule in California henceforth is that a prospective juror's statement that he does not "think"

---

[1]In *In re Hillery, supra,* 71 Cal.2d 857, 863, we stated that "[the prospective juror's] first expression of scruples concerning the imposition of capital punishment appeared in *her statement,* 'Well, I don't think I could send anyone to death.' We have held that *such a statement* would not, by itself, satisfy the *Witherspoon* requirement of unambiguous expression of an absolute inability to consider imposing the death penalty in any case. (*People* v. *Osuna . . . People* v. *Chacon . . . .*)" (Italics added.) We *then* set forth the question to which the prospective juror responded, in making the *additional* point that the context in which the juror's response was made compounded the ambiguity that we had already found present in the juror's statement itself.

he could impose the death penalty satisfies the constitutional standards enunciated in *Witherspoon.*

The majority assert that when Mrs. Bolla's statements are "viewed as a whole," her automatic opposition to the death penalty under any circumstances is made unmistakably clear. (*Ante,* p. 380.) As I have pointed out above, not one of Mrs. Bolla's statements constituted an unambiguous expression of opposition to the death penalty under the past holdings of this court. Rather, one of Mrs. Bolla's responses indicated that she could return a death verdict in some cases and every single one of "[h]er statements of opposition to the death penalty were hedged by phrases such as 'I think,' 'I feel,' [and] 'I believe,' . . ." (*People v. Vaughn, supra,* 71 Cal.2d 406, 416.)[2] It is difficult to see how the combining of these statements can result in the "unmistakably clear" statement that *Witherspoon* demands. I would hold that "[h]aving firmly declined to give the sort of 'unambiguous yes or no answer' required by *Witherspoon (People v. Chacon, supra,* 69 Cal.2d 765, 772), [Mrs. Bolla] was improperly excused." (*People v. Vaughn, supra,* 71 Cal.2d 406, 416.)

The error in excluding one juror in violation of the standard enunciated in *Witherspoon* automatically requires reversal of the death sentence. (*In re Argueilo,* 71 Cal.2d 13, 14-16 [76 Cal.Rptr. 633, 452 P.2d 921]; *People v. Bradford,* 70 Cal.2d 333, 346-347 [74 Cal.Rptr. 726, 450 P.2d 46].) Thus I would reverse the penalty judgments as to Terry because of *Witherspoon* error.

There is another error requiring reversal of Terry's penalty judgments.

Although I agree that the conceded violation of Terry's rights under *People v. Aranda,* 63 Cal.2d 518 [47 Cal.Rptr. 353, 407 P.2d 265], may reasonably be deemed harmless as to his guilt judgments, I must dissent from the majority's conclusion that this error was harmless as to the penalty judgments.

---

[2]The prospective juror held improperly excluded for cause in *People v. Vaughn, supra,* 71 Cal.2d 406, 412-417, was able to predict how she would vote in any case whatever insofar as she was able to state that she did not "believe" or "think" that she could ever bring in a death penalty. Similarly, Mrs. Bolla never stated unequivocally that she could not ever impose the death penalty, but only that she did not "think" she could ever do so. *Vaughn* distinguished *People v. Beivelman,* 70 Cal.2d 60, 78-79, fn. 4 [73 Cal.Rptr. 521, 447 P.2d 913], where the prospective jurors were able to state unequivocally that they would never vote for the death penalty in any case whatever—to predict how they would vote without qualifying their predictions by such equivocal terms as "think" or "believe."

As the majority note, any correct assessment of the impact of an *Aranda* error must "weigh the prejudicial impact of all of the significant effects that may reasonably be assumed to have stemmed from the erroneous denial of a separate trial," and we must reverse if there is "a reasonable probability that the defendant would have obtained a more favorable result at a separate trial." *(People* v. *Massie,* 66 Cal.2d 899, at pp. 922-923 [59 Cal.Rptr. 733, 428 P.2d 869].) And, as the majority also note, even if an error is nonprejudicial as to guilt, we must reverse a death *penalty* verdict in the face of any substantial error which could have affected the result. *(People* v. *Hines,* 61 Cal.2d 164, 168-170 [37 Cal.Rptr. 622, 390 P.2d 398]; see also, *The Death Penalty Cases* (1968) 56 Cal.L.Rev. 1268, 1434-1441.)

In relevant part, the majority describe the impact of the *Aranda* error as follows: "If the court had correctly ordered a severance when the *Aranda* problem presented itself, the jury in Terry's case would not have heard Juanelda's extrajudicial confessions. Further, it probably would not have heard her testimony that Terry pushed her around, that she was afraid of him, and that they had intercourse on their first date. There was also testimony that Terry beat Juanelda on one occasion and that he threatened to kidnap her. If there had been separate trials Juanelda probably would not have testified against Terry. Since she loved him, she probably would have invoked her privilege against self-incrimination. Had she testified, Terry would have been entitled to instructions that her testimony, as that of an accomplice, should be considered with caution. Furthermore, had there been separate trials, Terry's attorney probably would not have brought out—as he did on cross-examination of Juanelda—several prior crimes Terry and Juanelda allegedly engaged in together." *(Ante,* p. 387.)

I would add to this description of the effects of *Aranda* error on Terry's case the fact that a severance would have removed from the jury evidence—relating to Juanelda's duress theory—that Terry dominated Juanelda, that he used her youth, her submissiveness, and her love to coerce her into a life of vicious and brutal crime.

In denying that these incidents of *Aranda* error "were substantial and could have affected the result" *(ante,* p. 388), the majority blandly assert "the evidence in question, reasonably, did not affect the death penalty verdict. There was evidence introduced at the penalty trial that Terry had committed numerous priors. In view of this evidence, and the evidence properly introduced, of the brutality of the two killings, Juanelda's extrajudicial confessions and even her court testimony, were insignificant and unimportant. In fact, at the penalty trial, Terry's attorneys did not deny that he was a vicious killer or a depraved man. They argued that this condition was due to a form of mental illness in that he had sudden uncontrollable outbursts of fury." *(Ante,* p. 388.)

It is not clear that Terry's attorneys would have argued as they did at the penalty trial had a separate trial been granted. Even if a severance would not have altered the attorneys' penalty trial argument tactics, the majority's resolution of the harmless error question is totally unsatisfactory. Although we now have empirical evidence that introduction of a defendant's priors heightens the probabilities that he will receive a death verdict (*A Study of the California Penalty Jury in First-Degree-Murder Cases* (1969) 21 Stan.L.Rev. 1297, 1326-1330), nothing has altered the reason for the *Hines* penalty harmless error rule: our virtual ignorance as to what criteria are applied by any single penalty jury. (*Id.,* at p. 1420.) In *Hines,* we examined the unique aspects of penalty trials which render inapposite the "reasonably probable" harmless error rule which is applicable to guilt errors. Because of the absolute discretion afforded a jury presented with "a mass of material," because "[t]he precise point which prompts the penalty in the mind of any one juror is not known to us and may not even be known to him," and because " '[t]o attempt to assess the effect of error in this legal vacuum is to superimpose one untestable surmise upon another,' " we reaffirmed the rule that " 'any substantial error,' " since it reasonably may have swayed a juror, must be deemed to have been prejudicial. (61 Cal.2d at pp. 168-170, and cases cited.)

Whatever would have been the result if the only incidents of an *Aranda* violation were the introduction of Juanelda's confessions and evidence of several priors, I submit that it defies reality to assert that evidence that Terry coerced a young and submissive girl into a life of homicidal crime could not reasonably have swayed a juror on the issue of penalty. It bears emphasis that the majority concede this evidence would probably have been absent had Terry's *Aranda* rights been vindicated by a severance. To deny that this evidence could reasonably have affected his death verdict and to affirm on that basis is to "pile conjecture upon conjecture and posit the decision of life or death upon a pyramid of guesses." (*People* v. *Terry,* 61 Cal.2d 137, 154 [37 Cal.Rptr. 605, 390 P.2d 381].) Accordingly, I would reverse Terry's penalty verdicts because of *Aranda* error alone.

As to Juanelda Allen, the judgments of guilt should be reversed.

In the first place, the *Escobedo-Dorado* warning given to her was insufficient and incomplete as a matter of law, and in the second place, the record shows that before confessing she did not knowingly and intelligently waive her constitutional rights. Her confession was therefore inadmissible, and the error in admitting it was prejudicial and requires a reversal of the judgments against her.

The transcript discloses the exact words of the warning given to her before she confessed. The arresting and interrogating officer told her after her arrest that the police wanted to interrogate her "and that if you do want to answer the questions you are entitled to have an attorney present." This warning was insufficient, incomplete and incorrect. Of course, she was entitled to have an attorney whether or not she wanted to answer questions. To hold that a warning that the accused was entitled to have an attorney only if she decided to answer questions is sufficient to reduce the warning to a mere "ceremonial formula." Such a warning is inadequate. (*People* v. *Ford,* 234 Cal.App.2d 480, 489 [44 Cal.Rptr. 556].) As was said in that case the accused is entitled to "full advice as to his rights, with full comprehension of what they consist." The basic purpose for requiring counsel at the interrogation stage is to enable the accused to secure expert advice as to whether he should make any comments at all, and if so, of what nature. In *Escobedo* v. *Illinois,* 378 U.S. 478, 484-486, 490 [12 L.Ed.2d 977, 982-983, 985, 84 S.Ct. 1758], it was clearly indicated that the right to counsel was a right to consult with an attorney and to obtain advice from him so that the accused could make an intelligent decision as to whether to exercise his privilege against self-incrimination. In *Miranda* v. *Arizona,* 384 U.S. 436, 470 [16 L.Ed.2d 694, 721, 86 S.Ct. 1602, 10 A.L.R.3d 974], it was expressly held that the right to counsel includes the "right to consult with counsel prior to questioning." A comparison of the *Escobedo-Miranda* opinions demonstrates that this last quotation from *Miranda* was not one of the newly announced rules stated in that case which are not retroactive, but an explanation of why *Escobedo* was decided as it was. Although *Miranda* is not retroactive as to the newly stated rules set forth in that opinion (*People* v. *Rollins,* 65 Cal.2d 681 [56 Cal.Rptr. 293, 423 P.2d 221]), it is quite clear that the right to consult with counsel prior to interrogation and the right to be advised thereof, existed under the rules announced in *Escobedo,* and so existed at all relevant times in the instant case.

It is true that for *Escobedo-Dorado* purposes a warning has been held sufficient if the interrogating officer tells the accused that he has a " 'right to an attorney, . . .' " (*People* v. *Thomas,* 65 Cal.2d 698, 704-705 [56 Cal.Rptr. 305, 423 P.2d 233] [cert. den. 389 U.S. 868 (19 L.Ed.2d 143, 88 S.Ct. 140)].) But such language is broad and general and not misleading. It does not suggest, as does the warning here given, that the right to counsel is limited and circumscribed as to time and place. It has uniformly been held that when the warning is accompanied by conditions rendering it more limited than the right guaranteed by *Escobedo,* it is insufficient. An illustrative case is *People* v. *Kelley,* 66 Cal.2d 232 [57 Cal.Rptr. 363, 424 P.2d 947]. There the interrogating officer told the accused "that he

was entitled to an attorney 'now and at any time that I talked to him.' " (*Id.*, at p. 247.) That warning was held sufficient to justify an interrogation by the officer who gave it, but it was held insufficient to justify a subsequent interrogation by the military police. The error in the present case is similar. Juanelda Allen was told that she could have an attorney present while answering questions. She was never told that she had a right to consult with an attorney before she was interrogated—in fact the fair implication from the warning given is that she was told that she had no such right. Although she testified that she understood the warning to mean that she had a right to counsel, she did not testify, and there is no evidence to indicate, that she understood this warning to mean that she had a right to an attorney before interrogation. Under such circumstances, the warning was insufficient, the interrogation improper, and the confession inadmissible.

Even if the warning were sufficient there is no evidence that Juanelda knowingly and intelligently waived her constitutional rights. She was an immature minor of 17. While it is true that a majority of this court have held that a minor, in a proper case, may competently waive his constitutional rights (*People* v. *Lara,* 67 Cal.2d 365 [62 Cal.Rptr. 586, 432 P.2d 202] [cert. den. 392 U.S. 945 (20 L.Ed.2d 1407, 88 S.Ct. 2303)]), the determination of whether a minor has waived those rights is governed by rules much stricter than those applicable to adults (*id.*, at p. 381). In the case of minors this court is required to consider the "totality of circumstances" surrounding the waiver. In the "totality of circumstances" minority is a most important factor but here there was much more than minority alone. Juanelda was a member of a minority race. She was peculiarly immature. She was grilled for some time before she confessed. No friendly adult was present. In addition, the fact that the warning given her was misleading, if not incorrect, must weight heavily on the scales and is sufficient to tip them in her favor when considered as part of the "totality of circumstances" under which the confession was secured.

The circumstances under which this confession was obtained are accurately described in Juanelda's opening brief as follows: "We have here a young, seventeen year old, immature Negro girl . . . who is abruptly arrested and handcuffed by a horde of Police officers entering her apartment with guns drawn. . . . This, of course, makes her, as she termed it, 'more nervous than anything.' . . . She is then quickly transported to the Police Station and placed in a 8′ x 10′ room with no windows and a peephole that allows one to see in, but not to see out. . . . She is not told how long she will be there or when she will be taken to Court, nor is she given any information concerning her ability to place a telephone call to her family or to anyone else for aid or advice. . . . She is drilled [*sic*] intermittently by officers coming in and out and leaving her alone for various periods of

time. . . . She is completely alone in an antagonistic environment. . . . Without a specific explanation of what rights and ability she has to get counsel and advice without funds, her limited education . . . lack of maturity, and judgment, and her non-aggressive and passive personality . . . did not permit her to exercise sufficient determination or ingenuity to obtain the counsel and support which she needed in this environment to be sure that the whole story was presented and not just the facts which helped the Prosecution."

Moreover, there is no evidence that Juanelda knew or was advised of the elements of first degree murder or of the defenses available to her. While such warnings are not indispensable (*People* v. *Lara, supra,* 67 Cal.2d 365, 376), certainly Juanelda's ignorance of the nature of the offense, and the possible defenses of duress and coercion, is part of the "totality of circumstances" to be considered, and bolsters her argument that her waiver was unknowing and unintelligent. Her testimony is uncontradicted that when she was arrested she did not know that she could be held criminally responsible for the killings committed by Terry.

The case is indistingushable from *People* v. *Hildabrandt,* 244 Cal.App.2d 423 [53 Cal.Rptr. 99]. There an 18-year-old boy of subnormal intelligence confessed after an hour of police grilling preceded by the general warning that he had "a right to have an attorney present with him." (*Id.,* at p. 426.) The appellate court, after making the required independent examination of the record (*id.,* at p. 428) to determine whether the waiver of counsel had been knowingly and intelligently made, found that under the facts the general warning was insufficient and was given as a mere formality, and that as a matter of law the prosecution had failed to meet its burden of proof on the issue. (*People* v. *Davis,* 66 Cal.2d 175, 181 [57 Cal.Rptr. 130, 424 P.2d 682].) The court mentioned the accused's lack of experience with the police, his physical and mental state, his youth, and the shabbiness of the warning (244 Cal.App.2d at p. 431) and came to the conclusion that there had not been an intelligent and knowing waiver.

There is another prejudicial error requiring a reversal of the judgments as to Juanelda.

As pointed out in the majority opinion, the reporter's transcript discloses that prior to trial counsel for Juanelda moved for a severance. The motion was denied, and the parties were tried jointly. When the trial judge became aware of the rule then recently announced in *People* v. *Aranda, supra,* 63 Cal.2d 518, he refused to grant a severance for reasons the majority correctly hold to be inadequate. The majority contend, however, that the failure to grant her a separate trial was not prejudicial. In *People* v. *Massie, supra,* 66 Cal.2d 899, 921, the court in discussing the prejudicial effect

of failing to grant a separate trial stated that one test was "significant differences from the joint trial that would have occurred if the defendant had been tried separately, . . ." The majority recognize this standard but fail to apply it properly.

Keeping this standard in mind it is apparent that if ever a defendant was prejudiced by a joint trial, it was defendant Juanelda Allen. Had the trials been separate Terry's counsel would not have been able to cross-examine Juanelda. The record demonstrates that the attorneys for Terry in effect prosecuted Juanelda as effectively if not more so than did the prosecutor. Apparently it was the plan of Terry's counsel in a desperate effort to save their client's life, to try to prove that although Terry was guilty of first degree murder, Juanelda was equally as guilty, in that she helped actively to plan, and participated in, the crimes. Terry's counsel argued that although their client was guilty of first degree murder so was Juanelda, and since because of her youth, she could not be given the death penalty, Terry should not be sentenced to death either. It was Terry's attorneys who suggested that Juanelda stabbed Burnett. On the guilt trial Terry's attorneys devoted their entire argument to securing first degree murder convictions of Juanelda. It was Terry's attorneys who brought out in cross-examination of Juanelda, before it could be halted by objection, that she had been denied custody of her child and probably had been guilty of a welfare fraud. Other facts of which the prosecutor was apparently not aware (at least he did not bring them out) were developed by Terry's counsel in their cross-examination of Juanelda. They brought up the very damaging subject of Juanelda purchasing bullets for Terry's revolver after the Burnett killing, but before the Safeway episode. Terry's attorneys also intimated that Juanelda had gone target shooting with Terry, had actively planned with him the Alamo robbery, and had instigated a burglary in Oakland. In other words, Terry's counsel produced evidence against Juanelda not known to the prosecution.

Terry's attorneys cross-examined the psychiatrist called by Juanelda more effectively than did the prosecutor. It was they who elicited from him the admission that Juanelda had the ability and competency to aid and abet, and that the psychiatrist's testimony on direct went only to motivation.

It is clear that had separate trials been held the prosecution of Juanelda would have been vastly different from the joint trial. Because of the joint trial, there were three attorneys prosecuting Juanelda from two different points of view and sources of information, who were given two chances to argue her guilt to the jury, as well as two chances to cross-examine her. This eloquently demonstrates how and why she was prejudiced by a joint trial. What happened at the joint trial tended to obscure Juanelda's main

defense, that she did not know of Terry's criminal intent at either of the crimes prior to seeing him draw his revolver and that she aided him out of fear once he had drawn his gun. Although there was properly admitted evidence that strongly suggests that Juanelda knew robberies had been planned at both places, the psychiatric testimony produced by her was to the effect that she was immature and submissive and that she would blindly follow the man she loved without thinking about it.

Under such circumstances, Juanelda did not have a fair trial at her joint trial. Coupled with the other errors this requires a reversal. The deprivation of a fair trial is, of course, a miscarriage of justice. (*People* v. *Sarazzowski,* 27 Cal.2d 7, 11 [161 P.2d 934].)

I conclude that there was an *Escobedo-Dorado* error as to Juanelda; that there was no intelligent waiver of her right to counsel; that her confession was illegally secured and should not have been admitted into evidence; that she was erroneously denied a separate trial; and that these errors were prejudicial and require a reversal as to her.

Thus, I would reverse the judgments of guilt as to Juanelda Allen and the judgments as to Terry only insofar as they relate to the penalty.

The petition of appellant Terry for a rehearing was denied April 29, 1970, and the opinion was modified to read as printed above. Peters, J., was of the opinion that the petition should be granted.